UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

GERALD ANGELO BARCELLA,

               Petitioner,

vs.

TEREMA CARLIN,

               Respondent.

Case No. 3:10-cv-00048-CWD

**MEMORANDUM DECISION
AND ORDER**

Pending before the Court is Petitioner Gerald Angelo Barcella's Amended Petition for Writ of Habeas Corpus (Dkt. 9), which is now fully briefed and ripe for adjudication. (Dkt. 30, 35, 37, 40.) Both parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case in accordance with 28 U.S.C. § 636(c). (Dkt. 18.) The Court takes judicial notice of all portions of the record from Petitioner's state court proceedings lodged by the parties. *See* Fed. R. Evid. 201(b); *Dawson v. Mahoney*, 451 F.3d 550, 551 (9th Cir. 2006).

Having carefully reviewed the record and considered the arguments of the parties, the Court finds that the parties have adequately presented the facts and legal arguments in the briefs and that oral argument is unnecessary. *See* D. Idaho L. Civ. R. 7.1(d).

**MEMORANDUM DECISION AND ORDER - 1**

**INTRODUCTION**

In December 1997, 38-year-old Gerald Angelo Barcella was tried by a jury on a charge of murdering his boarding house manager, 69-year-old William Smith, by striking him in the head with a pulaski.[1] The criminal action was brought in the First Judicial District Court in Kootenai County, Idaho. The state sought the death penalty. At trial, Petitioner was represented by Chief Kootenai County Public Defender John Adams, who had handled several other death penalty cases, and co-counsel, Tim Gresback, private conflict counsel who was new to death penalty work. Lansing "Landy" Haynes was the lead prosecutor on the case. The Honorable Judge John G. Bengtson presided over the trial. Later, Judge John P. Luster presided over Petitioner's post-conviction and successive post-conviction actions.

After a lengthy trial, Petitioner was found guilty of first degree murder and a weapon enhancement. At the sentencing phase, the state district court determined that a sentence of death was not appropriate under the circumstances, citing Petitioner's lifelong struggles with psychological problems that often led to violent outbursts, and his otherwise strong ability to maintain work and close human relationships. Petitioner was instead sentenced to thirty years to life. The judgment of conviction was entered on

---

[1] A pulaski is a firefighting tool that "is about the size of a long-handled axe, but the business end of the tool has two sides: one side is an axe and the other is a grub-hoe." It can be used for "digging out water bars, cutting tree roots when digging, cutting small brush, [and] shifting piles of debris." Its invention is attributed to Ed Pulaski, a ranger with the United States Forest Service, who gained fame for saving 45 firefighters' lives in the Great Fire of 1910 near Wallace, Idaho. See https://streamsandforests.wordpress.com/2011/01/27/ed-pulaski-and-the-tool-he-invented; Timothy Egan, *The Big Burn* (Mariner Books 2010).

**MEMORANDUM DECISION AND ORDER - 2**

December 11, 1997. (State's Lodging A-6, p. 2050-51.) Petitioner has now served approximately twenty years of his sentence.

At trial, there was a substantial amount of evidence that Petitioner threatened to kill the victim, actually killed him, and then reported with some degree of satisfaction that he had done so. Notwithstanding the substantial admissible evidence pointing to Petitioner as the perpetrator, the trial proved to be unnecessarily bumpy, with multiple evidentiary errors,[2] including some occasioned by sloppy or intentional prosecutorial tactics.

Early in the case, five jailhouse informants volunteered to testify at trial that Petitioner had confessed to them in jail. (State's Lodging A-5, p. 6). Only two were called by the prosecution—Kenneth Agrifoglio and George Lane. Both testimonies involved difficult evidentiary issues. Agrifoglio had testified and was cross-examined at the preliminary hearing, but when brought to trial, he refused to testify. Petitioner was unsuccessful in his attempt to block the prosecution's request to read Agrifoglio's preliminary hearing testimony into the record. Lane testified at trial, but unexpectedly informed the jury of Petitioner's alleged prior bad acts, because prosecutors failed to warn him that he could not do so. Petitioner was unsuccessful in seeking a mistrial or calling Lane's criminal defense attorney to testify that prosecutors threatened that Lane would be held in contempt of court and lose his probation ("Rider"), if he did not testify. (State's Lodging A-6, p. 1650-63.)

---

[2] Not every error or potential error is mentioned in this Order, but all have been considered by the Court.

**MEMORANDUM DECISION AND ORDER - 3**

Throughout post-trial proceedings, Petitioner has taken issue with the reputation and credibility of the non-informant witnesses who testified against him. However, Petitioner fails to acknowledge that, before the trial began, he handpicked his witnesses, so to speak, because these are the same people Petitioner had surrounded himself with in his day-to-day life—his fiancée (Rikki Bobo, who was facing drunk driving charges and losing custody of her son),[3] his drinking partner (Kenneth Thrift, an illiterate man with 92 prior criminal convictions, nicknamed "Inbred" by Petitioner), a man who rented a room in the next building whom Petitioner harassed for effeminate behavior (Brad Bakie),[4] an unemployed boarder whose room was directly below the victim's room (Norman Bennett), and a bartender at one of the bars frequented by Petitioner (Wylene Smeltzer).

About this time period, Petitioner observed, "I was living in a flop house with a bunch of scum bags." (State's Lodging C-8, p. 214.) Petitioner admitted that his life at the boarding house had devolved into a dismal and base existence: "You lie with dogs, you get fleas, you know, but I was drinking. You drink and you kind of lose sight of your morals." (*Id*.)

The lifestyle of Petitioner and his associates was aptly characterized by Petitioner's counsel in this manner:

> [T]hose people that testified for the most part had been drunk for at least four solid days, that's what they did. Almost to the person that testified and lived in that apartment complex [sic] were mentally ill people who lived on S.S.I check, a welfare check, from check to check, and what they did when they got those checks is they drank them, that's what they did. They would

---

[3] Elsewhere in the record this first name is alternatively spelled "Rickie."

[4] Elsewhere in the record, this surname is alternatively spelled "Bakey."

**MEMORANDUM DECISION AND ORDER - 4**

> stay drunk for three and four days, they would take what drugs they could find, what prescriptions they could find to escape their mental illness. After four days or so when the money was gone, they would come down and wait for the next check to go in.
>
> [T]hat night [] was on the end of a four day run….

(State's Lodging A-5, pp. 181-82.)

On federal habeas corpus review, the standard for obtaining relief is especially rigorous, as defined by Congress. Only unreasonable errors of a federal or constitutional dimension warrant relief, and only after a careful review to determine whether such errors were harmless, given the totality of the record.

After carefully combing through the extensive record, the Court concludes that the errors that occurred were not of a constitutional dimension and that the record includes substantial evidence that Petitioner premeditated the killing of the victim. Accordingly, for the reasons more particularly set forth herein, the Court concludes Petitioner is not entitled to relief under the standards set forth in 28 U.S.C. § 2254(d)(1) or (2). Therefore, the Court will deny the Amended Petition and dismiss this action with prejudice.

## FACTUAL AND PROCEDURAL BACKGROUND

In *State v. Barcella*, 16 P.3d 288 (Idaho Ct. App. 2000), the Idaho Court of Appeals characterized the facts presented at trial and the trial proceedings as follows:

> On the evening of April 2, 1995, Barcella told Kenneth Thrift—his drinking buddy for the evening, Virginia Smeltzer—the bartender at the Watering Hole bar in Coeur d'Alene, and Brad Bakie that he intended to kill Smith, the elderly manager of the Harmony House apartments where Barcella resided.
>
> Returning to Barcella's room at the Harmony House apartments after the Watering Hole closed, Barcella and Thrift noisily entered the building and

**MEMORANDUM DECISION AND ORDER - 5**

went into Barcella's one-room apartment, across the hall from Smith's room. There, they continued to drink accompanied by the noise of the radio and television. Smith, through the door, told Barcella to turn the volume down. Barcella begrudgingly complied. Some time later, while Thrift returned to his room next door to get some cigarettes and more beer, Barcella entered Smith's room and bludgeoned him in the head with a pulaski [axe].When Thrift came back, about five minutes later, Barcella was at Smith's door, across the hall, wiping off the doorknob with his bandana.

Back in Barcella's room, Barcella told Thrift that he had killed Smith. The two continued drinking beer until about 4:30 a.m. and then left to get breakfast at Denny's Restaurant. From there, Barcella called his girlfriend Rikki Bobo. He told her to get over to Denny's and that he had killed Smith. Once she arrived, Barcella again told Bobo and Thrift that he killed Smith by striking him in the head three times with a pick ax.

After visiting with Barcella and Thrift at Denny's for nearly an hour, Bobo returned to Barcella's room at Harmony House. There, she noticed that Barcella's pulaski was not in his room. When Barcella arrived, Bobo, with Barcella's approval, wrote out a note addressed to Smith requesting a receipt for Barcella's rent payment. Barcella told her that the note was a good idea because it would make the police believe that Barcella thought Smith was still alive. Bobo slipped the note under Smith's door.

Later that afternoon, Peter Cooper, the owner of the Harmony House apartments, discovered Smith's body. Smith had several large head wounds and smaller wounds in his chest. A pulaski was found under a piece of carpet stuffed under Smith's bed. During the homicide investigation, officers discovered that Barcella, a convicted felon, possessed firearms in his room. While in jail on a charge of being a felon in possession of a firearm, Barcella was charged with first degree murder for the killing of Smith, I.C. §§ 18–4001 — 18–4003.

At the preliminary hearing, Robert Agrifolio,[1] a convicted defendant in an unrelated burglary case, testified that in September of 1995 he occupied a jail cell adjacent to Barcella's cell in the Latah County Jail. After identifying Barcella, Agrifolio testified that, while in the jail's recreation yard, Barcella told him he hit Smith in the head with an ax because he believed Smith had killed his puppy. Agrifolio was cross-examined

---

[1] "Agrifolio" should be "Agrifoglio," as it appears in the trial transcript. (See State's Lodging A-6, p. 1363.)

extensively about his prior convictions, his conversations with Barcella, and his reason for testifying. Agrifolio testified that he was under subpoena and denied being a jailhouse snitch or getting any benefit from testifying against Barcella.

Barcella was bound over to district court for trial on the charge of murder in the first degree. At trial, the state called twenty-two witnesses including investigating officers, medical experts, the Watering Hole bartender, the apartment owner, several apartment residents, Bobo, Thrift and two jailhouse informants—Agrifolio and George Lane.

Before calling Thrift, the state attempted to preclude impeachment through Thrift's prior criminal convictions. In part, Barcella sought to impeach Thrift by introducing evidence of his criminal history, arguing that Thrift is per se untruthful because honest people do not get arrested ninety-four times, forty-two of which were for felonies. The trial court ruled that Thrift's only felony convictions in the last ten years were two DUIs, not crimes relevant to truth and veracity under I.R.E. 609. Thrift testified that Barcella owned a pulaski when he moved into the Harmony House apartments, that Barcella had several times threatened to kill Smith, and that he had seen Barcella wiping off Smith's doorknob with a bandana when Thrift came out of his room with more beer. Thrift also stated that Barcella admitted to killing Smith once he and Thrift returned to Barcella's room to drink more beer and, again, after he and Thrift arrived at Denny's Restaurant for breakfast early the next morning.

Bobo also testified that Barcella owned a pulaski when he moved into the Harmony House apartments. She further testified to Barcella's admissions to killing Smith and acknowledged that she had written a note about rent payment that was slipped under Smith's door to prevent police attention from focusing on Barcella. After challenging Bobo's credibility by questioning her about a plea deal on a recent DUI charge and the state's grant of immunity regarding her writing the rent payment note, Barcella also sought to inquire about her status as a jail inmate and why she was allowed to testify in civilian clothing and makeup. The court sustained the state's objection to this line of inquiry.

The state then attempted to call Agrifolio as its next witness; however, the bailiff reported that Agrifolio had told the jailers that he refused to testify. Agrifolio was brought into court from the jail and questioned. After he indicated that he did not want to testify, the court appointed counsel for Agrifolio so that he could obtain legal advice before finally deciding whether or not to testify. A day later, Agrifolio's counsel informed the

**MEMORANDUM DECISION AND ORDER - 7**

court that Agrifolio would not testify. The district court determined that Agrifolio was unavailable. Four days later, the court, over Barcella's objection, permitted Agrifolio's preliminary hearing testimony to be read into the record.

The state's twentieth witness, Lane, also a jailhouse witness, testified that Barcella had admitted to killing his apartment manager by hitting him in the back of the head because the manager was nagging him about making too much noise. Lane testified that Barcella said a witness, his drinking buddy, had seen him come out of the manager's apartment on the night of the murder. Lane testified that Barcella was not worried about being prosecuted because in the past he had shot a couple of people and was never convicted. Barcella immediately objected and moved for a mistrial on the grounds that the state has elicited testimony about prior bad acts in violation of I.R.E. 404. The district court denied the motion for a mistrial and instructed the jury to disregard Lane's last statement.

Barcella also sought a mistrial on the ground that the state made a late disclosure of the first twenty-seven pages of the transcript of Bobo's statement to the police. The court denied the motion, suggesting Barcella could avoid any prejudice caused by late disclosure by recalling Bobo as a witness. Barcella declined to do so.

The trial court denied Barcella's motion for a judgment of acquittal made at the close of the state's case. During Barcella's case-in-chief, Barcella did not testify. After presenting several character witnesses in defense, Barcella sought to introduce testimony from Kootenai County Public Defender's Office Investigator Mark Durant. Durant was to testify that Agrifolio recently made several unsolicited telephone calls to him, stating that he—Agrifolio—had been pressured into testifying at the preliminary hearing and, that when asked if his preliminary hearing testimony had been truthful, Agrifolio had said he would "take the Fifth Amendment on that." The state objected and the court, without explanation, disallowed Durant's testimony.

16 P.3d at 291-93 (State's Lodging B-4, pp. 1-4.)

In addition to these facts, Petitioner had two evidentiary hearings in his post-conviction proceedings, which provided additional insight into the defense Petitioner wanted to present—that he lacked the capacity to form intent or malice because of his mental and psychological deficiencies and intoxication from alcohol and prescription

drugs. (State's Lodgings C-6, C-7, C-8, E-2.) Petitioner argued that he had sufficient

evidence to meet the statutory defense set forth in Idaho Code § 18-116, which, at that

time, provided:

> [W]henever the actual existence of any particular purpose, motive, or intent
> is a necessary element to constitute any particular species or degree of
> crime, the jury may take into consideration the fact that the accused was
> intoxicated at the time, in determining the purpose, motive or intent with
> which he committed the act.

While the jury was instructed on this defense at his trial, Petitioner believed that,

had the evidence been supplemented with his own testimony and that of his experts, it

would have been enough to obtain a manslaughter verdict. Particularly, mitigation expert

Mary Goody would have testified that Petitioner suffered through a difficult and abusive

childhood, where he developed post-traumatic stress disorder (PTSD), and that he "has

been adjudicated as mentally ill, suffering from a severe personality disorder and [PTSD]

by the Social Security Administration." (State's Lodging A-7, pp.78-79.)

Psychiatrist William Logan would have testified that, beginning in Petitioner's late

teens, his life "pattern [often] was that he would have either a manic episode, or a

depressive episode, that would lead to a lot of irritability, some anger, some substance

abuse, which then usually led to some kind of violent assault on someone, oftentimes

with minimal provocation." (State's Lodging A-5, pp. 96-102.)

Dr. Logan also would have testified:

> [Mr. Barcella] tended to be hypersensitive to any kind of criticism
> or perceived threats. . . .[A] psychologist, Dr. Rehnberg, noted that [Mr.
> Barcella] was also inclined to misperceive threats even when nonexistent.
> Often that resulted in a trigger that will get him to make him start brooding

about what somebody had done [sic] and then later erupt in a rageful attack against them.

Dr. Giller also noted that these attacks of rage can be so intense at times in Mr. Barcella that he may not even have a memory or have a partial amnesia for what occurred. That's a response also you see in PTSD among people who have been subject to fairly significant abuse.

(State's Lodging A-5, p. 113.)

Dr. Logan also would have testified that some of Petitioner's violent acts would "have been the product of his mental illness," but "[c]ertainly there are times when he has chosen to be violent." (*Id.*, p. 114.) In addition, Dr. Logan would have opined that [t]here is also an indirect choice involved in that he has relapsed in substance abuse, most of these things happen when he's drinking." (*Id.*) Further, Dr. Logan would have noted that when a person takes "Xanax with alcohol, the effect of it is doubled." (*Id.*) Dr. Logan would have testified that a number of lawsuits have been filed over people committing suicide or violent acts while on a prescription drug that is chemically related to Xanax and made by the same parent company, Upjohn, although this might have been met with an objection regarding foundation and relevance in Petitioner's particular circumstances. (*Id.*)

In addition, Dr. Logan would have opined that Petitioner did not have a choice in his genetic or environmental factors that "predisposed [him] to emotional [instability]," but "[c]ertainly he didn't have to drink," and [c]ertainly he knew to seek treatment at a time when he was in one of these situations." (*Id.*, pp. 115-16.) Dr. Logan opined that Petitioner's "ability to control his emotions is far, far from normal." (*Id.*, p. 116.)

**MEMORANDUM DECISION AND ORDER - 10**

Petitioner would have testified that, when Bobo brought Petitioner's Xanax to the jail after his arrest, 91 tablets were missing from the supply of 150 prescribed the same week. Petitioner believed, "I might have went over the dose [prescribed], I don't think I was taking them on purpose abusively," and "I don't know if I took way over what I was supposed to or if I took the amount I was supposed to. I do know that I didn't remember a lot of stuff." (State's Lodging A-8, p. 211-12.)

Dr. Craig Beaver, a psychologist, would have testified that Petitioner "is a person who knows the difference between right and wrong" and "has a conscience." (State's Lodgings A-5, p.155.) Particularly, Dr. Beaver opined:

> I certainly think that Mr. Barcella is capable of making choices in situations. I think that Mr. Barcella is a fairly complex gentleman. In some situations I think that it's pretty clear to me he has a great deal of latitude with regard to his free will or free choice, if you will. In other situations, particularly if he's either really depressed or manic and/or abusing substances or things of that nature, I don't think he does have much control over his impulses and aggressive behavior.

(State's Lodging A-5, p. 156.)

Petitioner would have testified that he recalled the time period surrounding the killing of Smith as follows:

> I had just got my Social Security check that week. I paid my rent, I believe I paid my rent. And I put it in a note and the money and slid it under Bill's door. I have no proof of that, maybe I didn't but I swear I did. I really believe I did.
>
> Anyway, I didn't go to work out that day or nothing. I only worked out five days a week and the other two days I would swim or do cardio work at the gym, but I didn't go to the gym that weekend. I was bummed out. My rent took a good chunk of my change, my money. I probably had $500 maybe $600 and my rent was like $240, it was a bigger room, Rikki was going to move in. I had given Jake [a puppy] away that week and all

the other stuff that happened. It brought up a lot of old bullshit. I was depressed and away from my family, I didn't even have a telephone. I was living in a flop house with a bunch of scum bags. Anyway, it was my own fault. (State's Lodging A-7, 213-14.)

After drinking for several hours in bars, Petitioner could not walk. (*Id.*, p. 216.) He

returned home and drank more alcohol throughout the evening and early morning hours.

(*Id.*, p. 216-18.) He recalled:

> The only thing I remember about coming into the Harmony House, I remember crawling to my room, crawling from the bathroom to my room. And I vaguely remember Bill coming and telling us, you guys can't come in here drunk at 2:00 in the morning, 3:00 in the morning, whatever it was. (*Id.*, p. 218.)
>
> * * *
> I was in my room and I drank a beer or two. I don't think I slept for those four days. And I do know that Rikki told the police, and I believe she testified at my trial that I didn't sleep, if at all, maybe an hour or two at night.
>
> I was in my room drinking, to make a long story short, I was drinking a beer. I heard some noise downstairs on the sidewalk, or right near the entrance to our laundry, I looked down there and there was four or five kids down there, 20-year-old people. There was a house next to Harmony House, it was on the corner, and there was a bunch of people that lived there, I don't know if they were college kids or what. They were making a noise and I yelled out the window and told them to shut up.
>
> I don't know what they said back to me. I don't know for sure, but I don't know why, I think maybe I was worried that Bill was going to yell at me for being noisy again and I didn't want to get in trouble.
>
> * * *
> I must have grabbed the pulaski and I went out to talk to those kids, and that's the last thing I remember.
>
> I woke up in Bill's room, sitting on my butt with my legs spread out. Bill was in a fetal position a couple of feel away from me. The pulaski was on the floor between us. Bill was dead. His eyes were glazed over, he wasn't breathing. He wasn't moving. (Witness upset.)

**MEMORANDUM DECISION AND ORDER - 12**

* * *

Before I left when I was in Bill's room, I freaked out and tried to push the pulaski under his bed. And the beds in the Harmony House were only about that tall [a few inches], and it got caught up on the carpeting.

*Id.*, pp. 219-23.

Petitioner also would have called lay witnesses to testify to his good character and reputation for honesty, but they would have testified, as they did at trial and at sentencing, that they did not know what Petitioner's lifestyle was like once he left Connecticut several years prior to the incident. (See State's Lodging A-6.)

Petitioner also would have attempted to show that the witnesses were lying. He asserts that Thrift did not return to the Harmony House with him that early morning, but it was Thrift's roommate, who was not summoned to trial. (However, Bennett testified that he recognized Thrift's voice in the hallway with another man, and heard the plant being knocked over and Smith chastening the men for making noise; Thrift testified to the same story.)

Petitioner also wanted to refute the testimony from many witnesses that he was angry with Smith, with this testimony:

Like I said, I didn't have any great animosity against Bill. A couple of times he was a little bit irritating in the hallway in the daytime, you know, telling me to be quiet with it was 12:00 in the afternoon [sic], but I didn't dislike him for it. I really appreciated him.

First of all, he let me bring my dog with me and move in there. He went out of his way to call Peter Cooper for me to let me move in. And then he went out of his way to let me move right across from him, even though a couple of times he told me to keep it down at night because my voice was too loud. I wasn't coming in like Thrift and those guys whiskey drunk,

**MEMORANDUM DECISION AND ORDER - 13**

running down the hall, screaming, playing grabass, I never did any of that stuff. I didn't' hang around with those guys. I was by myself.

    * * *

I had no problem with Bill. I don't know why I would ever threaten the man, I really don't.

(State's Lodging C-8, pp. 226-27.)

## CLAIMS AT ISSUE

After adjudication of Respondent's motion to dismiss several claims on procedural grounds, the following claims are briefed and ready for disposition:

(1)  Petitioner was denied the Sixth Amendment right to testify at trial;

(2)  Trial counsel was ineffective for failing to adequately communicate with him (if *Martinez* applies to excuse the default of this claim);

(3)  Petitioner was deprived of his Fifth, Sixth, and Fourteenth Amendment rights to confront and adequately cross-examine three of the State's witnesses;

(4)  Petitioner's Fourteenth Amendment rights were violated when Lane testified that Petitioner had two other shootings in his past, and the trial court denied a motion for a mistrial;

(5)  Petitioner's Fourteenth Amendment rights were violated when the State did not disclose until trial a transcript of a police interview with a State's witness;

(6)  Petitioner's Fourteenth Amendment rights were violated when the trial court denied his post-trial motion for a new trial; and

(11)  The cumulative effect of the evidentiary errors at trial violated Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

## STANDARD OF LAW FOR REVIEW OF CLAIMS

Federal habeas corpus relief may be granted where a petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).[5] Where the petitioner challenges a state court judgment in which the petitioner's federal claims were adjudicated on the merits, Title 28 U.S.C.§ 2254(d), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), applies. Title 28 U.S.C. § 2254(d) limits relief to instances where the state court's adjudication of the petitioner's claim:

1.     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). This standard is often referred to as the "AEDPA deference" standard. A federal habeas court reviews the state court's "last reasoned decision" in determining whether a petitioner is entitled to relief. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).

Where a petitioner contests the state court's legal conclusions, including application of the law to the facts, § 2254(d)(1) governs. That section consists of two alternative tests: the "contrary to" test and the "unreasonable application" test.

---

[5] Petitioner argues that the federal court has pendent or supplemental jurisdiction over his state law claims. Supplemental jurisdiction is not applicable in habeas corpus actions. Rather, the federal court can grant relief only on federal violations.

Under the first test, a state court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] [has] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). Stated more simply, "Section 2254(d) applies regardless of the procedures employed or the decision reached by the state court, as long as a substantive decision was reached." *Teti v. Bender*, 507 F.3d 50, 57 (1st Cir. 2007).

Under the second test, to satisfy the "unreasonable application" clause of § 2254(d)(1), the petitioner must show that the state court—although it identified "the correct governing legal rule" from Supreme Court precedent—nonetheless "unreasonably applie[d] it to the facts of the particular state prisoner's case." *Williams (Terry) v. Taylor*, 529 U.S. 362, 407 (2000). "Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* [Supreme Court] precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).

A federal court cannot grant habeas relief simply because it concludes in its independent judgment that the state court's decision is incorrect or wrong; rather, the state court's application of federal law must be objectively unreasonable to warrant relief. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003); *Bell*, 535 U.S. at 694. If fairminded jurists could disagree on the correctness of the state court's decision, relief is not warranted under § 2254(d)(1). *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). The Supreme

**MEMORANDUM DECISION AND ORDER - 16**

Court has emphasized that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (internal citation omitted).

Though the source of clearly established federal law must come only from the holdings of the United States Supreme Court, circuit precedent may be persuasive authority for determining whether a state court decision is an unreasonable application of Supreme Court precedent. *Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000). However, circuit law may not be used "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013).

When a party contests the reasonableness of the state court's factual determinations under § 2254(d)(2), the petitioner must show that the state court decision was based upon factual determinations that were "unreasonable in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). If the factual findings of the state court are not unreasonable, the Court must apply the presumption of correctness found in 28 U.S.C. § 2254(e)(1) to any facts found by the state courts. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

## CLAIM (1): CONSITUTIONAL RIGHT TO TESTIFY

Claim (1), presented in the successive post-conviction action, is that Petitioner had an absolute right to be advised that he had ultimate decision-making authority to determine whether he was going to testify *and* an absolute right to cast the deciding vote

as to whether to testify—whereupon counsel would have been required to craft the best defense he could around Petitioner's version of events, described above.[6]

## 1. Standard of Law Governing the Right to Testify

There is sparse United States Supreme Court precedent governing the right to testify. Although several cases mention the right to testify, the actual claims at issue were not about whether the defendant had the ultimate right to testify or overrule defense counsel's advice that the defendant should not testify. The following cases are illustrative of those cited by courts that have faced a right-to-testify issue; because each case is different from the facts in this case, the central factual issue and legal context of each case is noted in parentheses below.

In a criminal case, the defendant "has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (no right to force counsel to raise nonfrivolous claims on appeal). An accused's right to testify is protected by the Fifth, Sixth, and Fourteenth Amendments, but the right can be limited. *Rock v. Arkansas*, 483 U.S. 44, 51-54 (1987) (no right to introduce defendant's own hypnosis-induced statements).

"A criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." *United States v. Mezzanatto*, 513

---

[6] Claim (1) is a stand-alone constitutional claim based on the Fifth, Sixth, and Fourteenth Amendments; it is not based on an ineffective assistance of counsel (IAC) theory, even though Petitioner asserts that his counsel caused the loss of the right. Petitioner's claim is derived from his successive post-conviction action, rather than his first post-conviction action (where he did bring the claim as an IAC claim). However, the Court draws from the evidentiary testimony of Petitioner and his counsel and investigator from both hearings, because the facts underlying both claims are essentially the same.

U.S. 196, 201 (1995) (waiver of exclusionary provisions of plea-statement rules). A waiver is valid as long as it is knowing, voluntary, and intelligent. *United States. v. Ruiz*, 536 U.S. 622, 629 (2002) (waiver of *Brady* right in guilty plea context).

The right to testify is tied to the right to effective assistance of counsel, because the decision whether to testify must be made in the context of the overall strategy of the case. The "purpose of the constitutional guaranty of a right to counsel is to protect an accused from conviction resulting from his own ignorance of his legal and constitutional rights." *Jones*, 304 U.S. at 465. Therefore, whether a defendant testifies usually is attributed to the tactical strategy of counsel, who has weighed the benefits and risks of testifying, including exposing the defendant to cross-examination. "[A]bsent exceptional circumstances, a defendant is bound by the tactical decisions of competent counsel." *Reed v. Ross*, 468 U.S. 1, 13 (1984).

The United States Supreme Court has instructed that the "determination of whether there has been an intelligent waiver of the right to *counsel* must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (emphasis added). The Supreme Court has not particularly applied this contextual analysis to a waiver of the right to testify, but lower federal courts have done so, rejecting arguments like Petitioner's that defense counsel or a state court must follow a specific formula to render a waiver of the right to testify valid.

The Court agrees with Respondent that the standard the Idaho Court of Appeals applied, from *Rossignol v. State*, 274 P.3d 1, 7 (Idaho Ct. App. 2012), to find Petitioner's

**MEMORANDUM DECISION AND ORDER - 19**

waiver invalid is a more demanding state law standard not supported by United States Supreme Court precedent. In deciding the right-to-testify issue, the Idaho Court of Appeals considered the federal constitutional aspects of the claim, and decided it with an overlay of the more demanding state standard. In instances where "the state-law rule subsumes the federal standard—that is, if it is at least as protective as the federal standard—then the federal claim may be regarded as having been adjudicated on the merits." *Johnson v. Williams*, 133 S.Ct. 1088, 1096 (2013). As a result, the federal court must apply the deferential standards of §2254(d)—particularly the portion of §2254(d)(1) that requires this Court to determine whether the Idaho Court of Appeals' decision is contrary to United States Supreme Court precedent.

Because the United States Supreme Court has not delineated the boundaries of the right to testify, circuit precedent may be used to gauge whether the state court decision is within the bounds of "reasonableness." *See Marshall*, 133 S. Ct. at 1450. In *United States v. Martinez*, 883 F.2d 750 (9th Cir. 1989), the United States Court of Appeals for the Ninth Circuit determined that the trial court has no duty to advise the defendant of the right to testify, nor is the court required to place a waiver of the right to testify on the record. *Id.* at 760. Following *Martinez*, in *United States v. Edwards*, 897 F.2d 445 (9th Cir. 1990), the Ninth Circuit Court explained that the "broad rule that the court has no duty sua sponte to advise a defendant of his right to testify would be meaningless if it were possible for defendants to obtain new trials simply by claiming ignorance of the right." *Id.* at 446. In *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993), the Ninth Circuit Court held that, "[i]f the defendant wants to testify, he can reject his attorney's

**MEMORANDUM DECISION AND ORDER - 20**

tactical decision by insisting on testifying, speaking to the court, or discharging his

lawyer." *Id*. at 177 (citing *Martinez,* 883 F.2d at 761). In other words, "waiver of the right

to testify may be inferred from the defendant's conduct and is presumed from the

defendant's failure to testify or notify the court of his desire to do so." *Id*. (citing

*Edwards,* 897 F.2d at 446, and *Martinez,* 883 F.2d at 760).[7]

## 2. Discussion

Because the Idaho Court of Appeals used a more demanding state law standard to

determine Claim (1) but nevertheless determined the constitutional claim, this Court

reviews the decision against the standard of § 2254(d)(1)—whether the Idaho Court of

Appeals' decision denying relief is contrary to the United States Supreme Court

precedent described above. Relevant factual findings of the state court are presumed

correct, but Petitioner may rebut the findings with clear and convincing evidence.

This Court first notes that charting the analytical path of Petitioner's claim is

somewhat difficult because of the difference between state and federal standards. The

Idaho Court of Appeals determined that trial error occurred (under a state case

interpreting a federal standard), but ultimately determined that the error was harmless.

Here, the Court concludes that a constitutional error did not occur; thus, the Court cannot

reach a harmless error analysis, which is possible on habeas review only when a

constitutional (not state law) error occurred. Much of Petitioner's argument is aimed at

harmless error, which the Court does not reach. However, because the right-to-testify

---

[7] Other courts use different standards, demonstrating that there is no clearly-established law on this point. *See Boyd v. U.S.*, 586 A.2d 670 (D.C. Ct. App. 1991) (collecting cases under three different approaches).

MEMORANDUM DECISION AND ORDER - 21

claim must be considered within the context of the defense case strategy, the Court will address Petitioner's arguments regarding the underlying facts upon which the Idaho Court of Appeals made its harmless error decision, because many of the facts are relevant to an understanding of why Petitioner's counsel advised him not to testify, and why the circumstances of the case show that Petitioner acquiesced to that strategy and, in so doing, waived the right to testify.

### A. Unreasonable Determination of Facts under 28 U.S.C. § 2254(d)(2)

Petitioner argues the Idaho Court of Appeals made the following unreasonable determinations of fact regarding the failure to testify:

(1)     The court believed that Petitioner's proposed testimony regarding his level of intoxication would have added nothing of significance to the evidence already before the jury;

(2)     The court misstated Brad Bakie's testimony and did not consider Petitioner's rebuttal regarding the alleged threats toward the victim; and

(3)     The court believed that certain evidence indicated that Petitioner was not in an alcoholic blackout at the time of Mr. Smith's death, that Petitioner's admissions and actions after Mr. Smith died demonstrated that he was lucid and that he acted in a conscious, calculated, and considered manner.

(Petitioner's Reply, Dkt. 35-2, p. 1.)

The Court's first task is to determine whether one of five types of unreasonable factual determinations occurred: (1) when state courts fail to make a finding of fact; (2) when courts mistakenly make factual findings under the wrong legal standard; (3) when "the fact-finding process itself is defective," such as when a state court "makes evidentiary findings without holding a hearing"; (4) when courts "plainly misapprehend

or misstate the record in making their findings, and the misapprehension goes to a

material factual issue that is central to petitioner's claim; or (5) when "the state court has

before it, yet apparently ignores, evidence that supports petitioner's claim." *Taylor v.*

*Maddox*, 366 F.3d. 992, 1000-01 (9th Cir. 2004).

### (1)  Level of intoxication and supporting testimony

Petitioner argues that he wanted to present more to the jury than just his level of

alcoholic intoxication. Petitioner's successive post-conviction counsel summarized

Petitioner's post-conviction evidentiary hearing testimony as follows:

> Gerry testified that he had been drinking a tremendous amount over the
> course of several days preceding Smith's death. In addition, he testified to
> his post-traumatic stress disorder, his alcoholism, his depression, and his bi-
> polar illness. Further, he told the Court that he had been taking a "mega-
> dose" of Xanax. He testified . . . that he was having periods of blackouts
> wherein he was unaware of what he was doing and had no memory of what
> had transpired after the fact.

(State's Lodging D-1, p. 23.)

Taken at face value, the Idaho Court of Appeals' characterization of Petitioner's

proposed testimony as focusing on only his "level of intoxication" seems lacking.

However, there may be two different reasons for such a brief description of Petitioner's

testimony in the state court opinion. The first is that the Idaho Court of Appeals

considered the entire record, determined that Petitioner's testimony would not have been

helpful, and simply chose to include a brief summary in the opinion.  The second

possibility is that the Idaho Court of Appeals had before it, yet apparently ignored,

evidence that supported petitioner's claim that he wanted to present much more about his

mental state than mere intoxication, and, therefore, his testimony was not merely

**MEMORANDUM DECISION AND ORDER - 23**

cumulative of other witnesses who testified only of his level of intoxication. In the event that the second scenario is true, and the Idaho Court of Appeals erroneously determined the facts as to this issue, the Court considers below whether the lack of consideration of the entirety of Petitioner's testimony rendered the Idaho Court of Appeals' decision on this claim contrary to United States Supreme Court precedent.

### (2)    Evidence showing Petitioner's mens rea and malice

In the successive post-conviction proceeding, the Idaho Court of Appeals determined that the record contained "substantial evidence supporting the jury's finding that the murder was premeditated." (State's Lodging F-4, p. 6.) As support for this determination, the Idaho Court of Appeals represented that the evidence at trial showed that "Barcella told Thrift and Smeltzer he intended to kill Smith" and that Brad Bakie "heard Barcella make the same threats regarding Smith approximately ten times." (State's Lodging F-4, p. 6.) Earlier, on direct appeal, the Court of Appeals made the same mistake about Bakie's testimony. In footnote 3 of that opinion, the court states: "Bakie testified that he heard Barcella threaten to kill Smith ten times on the evening of April 2, 1995." (State's Lodging B-4, p. 9.) In reality, Bakie testified that he heard Barcella say he would *get even* with Smith about ten times (State's Lodging A-6, pp. 919-22), but Bakie never said that he heard the *same threat* as Thrift and Smeltzer heard—which was that Petitioner intended *to kill* Smith. ( See i*d.*, pp. 498 & 560-61).

Therefore, this Court concludes that the Idaho Court of Appeals made an erroneous finding of fact by misstating the record in making its findings; the question remains whether the misstatement goes to a material factual issue that is central to

petitioner's claim. Here, this Court concludes that the misstatement is not material in light of the fact that *all* of the witnesses testified that Petitioner *threatened* Smith before Petitioner killed Smith, with two out of three testifying that the threat was *to kill* Smith, and the other testifying that Petitioner intended to get even with Smith. All of these threats showed that Petitioner had a motive and the mental wherewithal to premeditate the killing.

Related to the testimony about the threats is Petitioner's further argument that the Idaho Court of Appeals' decision was unreasonable because it did not rely on Petitioner's post-conviction hearing testimony that these witnesses *must have been mistaken in what they heard*. Petitioner testified that he was not threatening to kill Smith, but he was instead threatening to kill "Birdie," a biker "enforcer," who earlier had threatened to kill Petitioner. This argument is unsupported by the context of the witnesses' stories.

The Idaho Court of Appeals' task in its harmless error review was to consider all of the evidence and determine what may or may not have made a difference at trial. Petitioner's testimony about a threat against a biker would not have been deemed credible, because all of the witnesses testified that Petitioner made the threats against Smith in the context of Petitioner stating that he was upset that Smith had left a note instructing him to remove an offensive sign from his door, that Brad Bakie described as saying that Petitioner "didn't want no faggots, niggers, Jews or homosexuals or whatever knocking on his door." (State's Lodging A-6, p. 920.) There is nothing in the testimony of the witnesses to indicate that Petitioner was discussing a different incident with these witnesses—that the Gypsy Joker motorcycle gang had jumped him and threatened him—

**MEMORANDUM DECISION AND ORDER - 25**

such that they could have misunderstood. In addition, the witnesses' testimony corroborated one another regarding Petitioner's anger over being told to remove his sign.

Therefore, while there is a mistake of fact in the record as to the type of threats Bakie heard, and Petitioner testified that the threat to kill or get even with someone was not directed toward Smith, these arguments do not show that the Idaho Court of Appeals unreasonably determined the facts as to a material issue central to Petitioner's defense that he had no animosity toward Smith. Considering the totality of the trial testimony and the uncorroborated proposed testimony of Petitioner, the Court agrees that there was sufficient evidence in the record that Petitioner premeditated the killing, as more fully described below described below, regardless of how the Idaho Court of Appeals characterized Bakie's testimony regarding the particular threats he heard.

### (3)   Determining Petitioner's lucidity by considering all the circumstances

Petitioner also argues that the Idaho Court of Appeals made an unreasonable determination of the facts regarding whether there **was** sufficient evidence in the record that Petitioner was lucid at the time of the killing. Petitioner argues that some of the evidence that the Court of Appeals cites in support of its opinion does not support the conclusion that Petitioner was lucid *at the time* he killed Smith, but instead focuses on acts *after* Smith was dead—that Petitioner pushed the pulaski under the bed when he awoke from his blackout, that Petitioner wiped down Smith's outside door handle with a bandana, and that he agreed with Bobo that writing a note about a rent receipt and slipping it under Smith's door would be a good way to "throw the police off, causing

them to think [he] believed Smith was still alive." (State's Lodging F-4, p. 6.) The

difficulty with Petitioner's argument is that he paints a very narrow scope of lucidity—

based only on *his* testimony and ignoring the testimony of other witnesses. He argues that

the precise issue to be determined was whether Petitioner was lucid *at the time* he killed

Smith, not whether he was lucid before or after the incident. He would have testified at

trial that he was not lucid until he awoke from his blackout and found the pulaski

between himself and Smith's body.

     The most relevant testimony cited by the Court of Appeals that points to

Petitioner's lucidity at the time of the killing is Rikki Bobo's testimony, "He told me that

he had hit Bill [Smith] once and Bill had gone to the floor and he was flopping around

like a fish, so he hit him again – no, that he knew he wouldn't survive, so he hit him

again just to make sure." (State's Lodging A-6, p. 699.) Petitioner's counsel adequately

cross-examined Bobo to bring out the fact that she had not used this language in any of

her police interviews. However, the preliminary transcript indicated that Bobo had

testified similarly to the specific point at issue here: "And he said 'I hit him once and he

went down and I knew he couldn't recover and he could identify me, so I hit him again

just to make sure he was dead.'" (*Id.*, p. 772.) Petitioner points to the fact that Bobo

admitted that, when police first questioned her, she denied knowing anything about

Smith's killing; she changed her story when she was arrested for DUI and was threatened

with loss of her son. Because the jury heard all of that evidence, and Bobo was one of the

main witnesses connecting Petitioner to Smith's death, it is obvious that the jury credited

**MEMORANDUM DECISION AND ORDER - 27**

her testimony to the extent that it supported a first degree murder conviction.[8] The Court of Appeals was correct in pointing to the Bobo testimony about what Petitioner observed during the killing—the most relevant time period going to Petitioner's lucidity.

Another piece of evidence that supports the finding that Petitioner was lucid during the killing is George Lane's testimony that Petitioner told Lane that Smith fell to the floor after the first strike, hitting his head on a railing as he fell. A photograph of the left side of the victim's head showed an injury consistent with that description. (State's Lodging A-6, pp. 1231.)

Other evidence in the record is Bobo's and Thrift's testimony that, shortly after the killing, Petitioner told them, "I just killed that mother fucker," which indicates both his animosity toward Smith and that he had an awareness that he had killed Smith. (State's Lodging A-6, p. 575.) Otherwise, Petitioner might have stated something like, "I just woke up from a blackout in Smith's room, sitting across from Smith's body, with a pulaski between us, and I think I killed him but can't remember doing so."

Simply because the Idaho Court of Appeals used an expansive view of the evidence to determine lucidity at the time of the killing does not mean that its decision is unreasonable. A survey of Idaho cases shows that, in several Idaho criminal cases in

---

[8] The record reflects that, at the start of the investigation, no one wanted to become involved and come forward to tell the police what they knew about the crime—not Petitioner's fiancée, his drinking partner, or the bartender who had been a friend of the victim. All eventually came forward with stories that somewhat matched each other's. Defense counsel cross-examined them all thoroughly about how they had lied to police investigators early in the case, how they had changed their stories over time, and how they had implicated Petitioner in the killing only when it was advantageous for them to do so. Therefore, the jury was left to assess credibility, based on having heard their testimony, including their explanations of the contradictions and potential biases. Of all who testified or would have testified, Petitioner is the one who had the greatest motive to fabricate a story to attempt to get a lesser sentence, the one who stood alone in relaying what happened (without corroboration from the other witnesses), and the one whose testimony made the least amount of sense, even standing alone.

**MEMORANDUM DECISION AND ORDER - 28**

which mens rea is at issue because of a claim of mental defect or intoxication caused by alcohol or drugs, the Idaho appellate courts generally have considered a defendant's acts before, during, and after a killing to determine whether the defendant could meet Idaho Code § 18-116—that the jury could take into consideration intoxication when "determining the purpose, motive or intent with which he committed the act."

For example, in *State v. Tucker*, 848 P.2d 432 (Idaho Ct. App. 1993), the court rejected the defendant's argument that there was insufficient evidence to support a finding that he possessed the specific intent to commit burglary because of uncontradicted evidence of his extreme intoxication at the time of the events. Rather, the court pointed to the following wide scope of evidence:

> Tucker did have the ability to carry on a conversation with a police officer, to make a telephone call, to create an excuse for returning to the wrecker, and to drive the truck for some twenty-five miles at an extreme speed. Moreover, Tucker based his intoxication defense on his claim that he had blacked out during periods of the night in question. The state rebutted this claim with testimony from one of Tucker's former cellmates in the county jail. This witness stated that while in jail Tucker had recited specific details of the events, and that Tucker said he did remember taking the truck, and that he did remember seeing the roadblock but chose not to stop. This testimony, albeit in conflict with that given by Tucker, was sufficient from which a reasonable juror could find that Tucker possessed the intent necessary to commit the crimes, and therefore sufficient to support the verdicts.

*Id*. at. 434.

Likewise, in *State v. Baldwin*, 208 P.2d 161 (1949), the court viewed not only what happened before and during the crime, but what type of mental ability it took to carry out the crime:

**MEMORANDUM DECISION AND ORDER - 29**

Although not admitting that he made and passed the check, the appellant based his defense entirely upon the proposition that he became so intoxicated, around Thanksgiving time in 1946, that he did not know what he was doing. He testified, "I got drunk in Klamath Falls, and came up here, and I came to myself in Walla Walla on Thanksgiving Day;" and further, that he had no recollection of going to the Petersons' fur store or the purchasing of a fur coat, or of going to Orofino or making a deposit in the bank there. [However,] [t]o plan and execute a forgery, such as that shown here, requires at least some degree of ability to think and enough cunning not to arouse suspicion in the victim. So when the jury found him guilty on a charge of acting "with intent to defraud" it necessarily found that he had the ability to "form an intent' to defraud."

*Id*. at 165.

In Petitioner's case, the Idaho Court of Appeals reasonably considered Petitioner's words and acts before, during, and after the killing to determine whether the record reflected that he was "lucid" when he committed the killing. In so doing, the Idaho Court of Appeals considered Petitioner's own proposed testimony, as well as the witnesses who testified to Petitioner's admissions and acts. In Petitioner's favor is evidence that he committed the killing at the end of a long drinking binge while on the prescription drug Xanax; not in his favor is evidence that he threatened to commit the killing multiple times during his drinking binge. Contrary to Petitioner's "blackout" story, witness testimony showed that Petitioner was able to recall and relay to his friends particular details of the killing. Also contrary to Petitioner's story is evidence of the definitive way he described what he had done, rather than describing an unknown event that seemed to have occurred during a blackout. At Denny's, he said: "I just killed that mother fucker." In his room, he said: "I killed that fucker. Let's go hunting." (State's Lodging A-6, pp. 575-76.)

**MEMORANDUM DECISION AND ORDER - 30**

This Court concludes that the Idaho Court of Appeals' opinion is not based on an unreasonable determination of the facts in light of the record before it, simply because it considered facts *before and after* the killing to attempt to gain a clear picture of whether Petitioner was lucid at the time he committed the killing.

### B.    Whether Decision is Contrary to Supreme Court Precedent

Having determined that the fact finding of the Idaho Court of Appeals was not unreasonable, the Court now determines whether the record indicates that Petitioner agreed with his counsel's strategy to have Petitioner remain silent. The Court concludes that Petitioner voiced his desire to testify to Adams, but Petitioner ultimately decided to follow Adams's advice not to testify for the reason that Adams was a lawyer and Petitioner was not. Because Petitioner's proposed testimony provides a picture of the kind of testimony that Adams had to evaluate in making the decision whether to call Petitioner, the Court has included a synopsis of the testimony in this section.

The Court will begin by reviewing Petitioner's testimony at the post-conviction hearing that demonstrated the reasons Petitioner acquiesced to his counsel's defense theory:

> Q.    Did you talk with Adams at some point about these various degrees of murder?
>
> A.    John told me, "You're not getting a manslaughter defense, and that's it, period.
>
> Q.    Didn't have any explanation with you as far as why that was?
>
> A.    No. One time – I asked him a few times, one time, and he told me, "You're not getting a manslaughter defense, and that's it. He says, "*You'll be found guilty and sentenced to death.*"

**MEMORANDUM DECISION AND ORDER - 31**

(State's Lodging C-9, p. 43-44 (emphasis added).)

Petitioner was questioned at the post-conviction hearing about whether he helped decide or agreed that he should not testify at trial, because of the risk of the death penalty in the case:

> Q.   And you played a role in your decision, the idea that you wouldn't testify?
>
> A.   I wanted to testify and, you know, he told me no. And he wouldn't let – he wouldn't talk to me. He wouldn't talk to me about the crime. He told me – basically he told me he didn't want to talk to me about it.
>
> Q.   But you were scared to tell the truth at that point because you're facing the death penalty, and you don't want that to happen to you.
>
> A.   I was – I was listening to my attorney. Yeah, I was scared to death of getting the death penalty.
>
> Q.   And you talked to John Adams about that?
>
> A.   Yeah.

(State's Lodging C-9, pp. 17-18.)[9]

Petitioner added that, while he was following his attorney's advice going into the trial, he again thought he should testify when, during voir dire, he heard two prospective jurors voice their opinion in front of the whole jury pool that there is no reason a defendant who is not guilty would not stand up for himself and testify.

---

[9] At the post-conviction hearing, Adams could remember virtually nothing about the case. He speculated that, because he mentioned Petitioner's prior felon-in-possession-of-a-gun conviction in his opening statement, it would have been in anticipation of having Petitioner testify. He came to that conclusion from reading the Court of Appeals' direct appeal opinion, which mentioned the opening statement. (State's Lodging A-7, pp. 165-66.) However, he did not put Petitioner on the stand to testify, and Petitioner states that Adams told him he could not testify. Obviously, at some point in time, Adams told Petitioner he would not be called to testify, and Petitioner did not assert his right to testify over Adams' decision.

**MEMORANDUM DECISION AND ORDER - 32**

> I was listening to my attorney, and he – in the beginning of my trial, the way he set everything up, he did everything. And he told me that I'm not going to testify. And that's it. We went to trial. They put those two guys – those two jurors started saying that I was guilty because I wouldn't testify and everything. And at that point I started telling John, "I've got to testify."

(*Id.*, p. 18.) Neither panelist was selected for the jury, and Petitioner did not make a demand to testify by asking his attorney to withdraw or notifying the judge, but again acquiesced to the planned trial strategy.

At the point in the trial when Lane stated that Petitioner had committed two prior shootings, Petitioner again thought he should testify. Even though the statement was stricken from the record and the jurors were admonished to disregard it, Petitioner believed that this comment was so harmful, "you couldn't unring the bell." However, Petitioner's proposed remedial testimony was not necessarily helpful. At the post-conviction hearing, Petitioner stated that he would have rebutted Lane's statement by testifying, "On the second degree assault, I was jumped by 15 men and I was almost dead, and I ended up shooting a man. I tried to shoot him in the leg and I ended up shooting him in the testicle." (State's Lodging C-8, p. 186.) Petitioner's expert witness, Dr. Logan, characterized this incident as Petitioner having "engaged in a bar fight in which he in fact shot a passerby, as the bystander, in the leg and scrotum," and observed, "That resulted in another incarceration." (State's Lodging A-5, p. 103.)

Petitioner also wanted to clarify that the "shootings" were not murders: "I've never [gotten] away with any shooting, and I did have first and second degree assaults for shooting below the waist. . . And like I said, I served five and half months on one with three years' probation, and nine months for the pistol on the other one and given

probation for the second degree assault, five years' probation." (State's Lodging C-8, p. 187.) Petitioner also wanted to testify: "At that point George Lane uttered that statement that I probably had gotten away with two other shootings, it was total fabrication. It was a lie. I never got away with this. I never got accused of shooting fatal or nonfatal. I've never been accused of any other violent crimes, and I wanted to clear that up." (*Id.*) Petitioner fails to appreciate that this testimony likely would have made things worse for him, not better.

Petitioner also would have testified at trial about another "shooting" incident, albeit with no intended victim, and multiple incidents of weaponless violence. For example, Petitioner would have testified that, when he heard Thrift and Bakie engaged in loud sexual behavior, and they refused to quiet down, Petitioner took the following action:

> I go back to my room and we try to sleep again for another hour or hour and a half and I'm banging on the wall telling them to keep it down. Finally, I took a .22 rifle I had and I popped a shot up in the corner of the ceiling in the upper part of the wall so no one would be hurt, and they finally quieted down after that. I wanted to testify to all these things.

> Yeah, I got in a lot of fist fights, I was a drunk, I went to bars, I hung around with tough people, I fought against a lot of tough people. You know, a lot of people want to come, they hear a reputation about you, maybe they want to test you.

> I fought a lot, I wasn't a killer. I never was a killer, I never will be.

(State's Lodging C-8, p. 193.)

In addition, Petitioner recognized that his lay character witnesses would have testified similarly to his own proposed testimony:

**MEMORANDUM DECISION AND ORDER - 34**

> And those character witnesses would have said Gerry's been in a lot of fights. A couple of them, I'm sure, would have said, yeah, Gerry's shot a couple of people in fights, you know. But they would have told them what kind of people they were [one was a "mob, mafia guy" and the other was a "bad, bad dude," who "killed his friend, Gus, over a woman," and "tried to kill me one night."].

(State's Lodging C-8, p. 231, 227.)

Petitioner fails to recognize that all of this proposed testimony would have served as undesirable propensity evidence, compounding rather than helping to contextualize Lane's "other shootings" statement. In addition, the foregoing proposed testimony is only a sample of the incongruous testimony Petitioner desired to give at the guilt phase of a death penalty trial. It is no surprise that his counsel decided not to include Petitioner's testimony. It would not have been particularly helpful for Petitioner to testify that he did, in fact, commit two shootings, but *didn't get away with them*. Or, that because some of the boarders engaged in loud homosexual relations without regard to other boarders' efforts to try to sleep, Petitioner was justified at firing his .22 into the ceiling. That Petitioner, his expert witness, and his character witnesses would have testified that he repeatedly placed himself in circumstances where he engaged in less-than-fatal violent behavior would have been harmful to his case. It would have been nearly impossible for counsel to control on direct examination Petitioner's long, rambling, contradictory, and harmful testimony, as demonstrated in his sentencing and post-conviction hearings.

Cross-examination could have been disastrous for Petitioner if the prosecutor had offended or angered Petitioner, which would have been the prosecution's likely strategy. Petitioner's own counsel described Petitioner's communications as being "generally

**MEMORANDUM DECISION AND ORDER - 35**

abusive," and it is likely that this type of attitude would have manifested in Petitioner's communication with the prosecuting attorney during a harsh cross-examination. (State's Lodging E-2, p. 87.)

In addition, cross-examination at trial may have brought out additional harmful testimony. For example, at the post-conviction hearing, Petitioner testified that it is possible that he might have wiped off the door handle to Smith's room with a bandana (which negates his story that Thrift was not with him on the night of the killing because Thrift testified to that act). (State's Lodging C-9, p. 14.) Petitioner also speculated that he "might have" killed Smith because Smith came out and yelled at him for carrying a pulaski. (*Id.*, pp. 11-12.)

Turning to a review of Adams', Gresback's, and the investigator's testimony at the successive post-conviction hearing that is relevant to the right-to-testify and defense strategy decisions, this Court first notes that the Court of Appeals relied on the following testimony to support its harmless error decision:

> Barcella's lead attorney testified that he knew the distinction between advising a client not to testify and preventing a client from testifying. The lead attorney further stated he could not recall ever preventing a client from testifying. The lead attorney made clear that, while he would often advise clients against testifying, it was the client's decision to make. Co-counsel for Barcella testified he did not recall any disputes regarding Barcella wanting to testify at trial. A criminal investigator, who was employed at the public defender's office at the time, testified that their office had a rule that it was the defendant's decision regarding whether to testify. The investigator also stated it was the general practice of the office to explain that rule to clients, both before and during trial.

(State's Lodging F-4, p. 3.) Second-chair counsel, Tim Gresback, testified about how their office had a policy that they had to have some type of contact with a detained death-

**MEMORANDUM DECISION AND ORDER - 36**

penalty defendant every five days. (State's Lodging E-2, pp. 87.) The post-conviction

testimony consisted mostly of statements of how the public defender office *generally*

operated, because of the long stretch of time between the trial and the post-conviction

matter; none of the witnesses could recall particularly what happened in Petitioner's case.

As to the strategy chosen, Adams testified that it is hard to "talk to a jury out of

both sides of your mouth and get them to believe anything you say when you argue both

that you didn't commit the crime, but if you did, it was a lesser included offense."

(State's Lodging C-8, p. 180.) As the record reflects, Adams selected an acquittal

theory[10] of defense that did not include testimony from Petitioner—the theory he thought

most likely to protect Petitioner from the death penalty. Petitioner agreed to the theory,

because he was "scared to death of the death penalty." Petitioner not only acquiesced to

this defense theory throughout the trial, but he continued to follow his attorney's

instructions to remain silent about the crime at sentencing and through direct appeal.

(State's Lodging C-9, p. 21-24.)

Given that Petitioner wrote 638 kites to his lawyers, he surely could have written

one pro se motion to the court asking for his lawyers to be removed from his case

because they refused his demand to testify. Petitioner was certainly not new to criminal

litigation and working with defense attorneys (having been convicted of four prior

felonies); in addition, the record demonstrates that he has a rather assertive personality.

Thus, he is hard-pressed to argue that his attorneys simply overpowered his will.

---

[10] Adams described this theory as making the prosecution meet their burden of proof, not putting on a defense of
factual innocence. (State's Lodging A-6, p. 162.)

**MEMORANDUM DECISION AND ORDER - 37**

The Court concludes that Petitioner has not shown that he rejected his attorneys' tactical decision by insisting on testifying, speaking to the court, or discharging his attorneys at any point during his proceedings. Rather, Petitioner's knowing and voluntary waiver of his right to testify may be inferred from his conduct and is presumed from his failure to testify or notify the court of his desire to testify. The strategy to avoid putting Petitioner on the stand was sound, and it was calculated to save his life.[11] Accordingly, because Petitioner has not shown that the Idaho Court of Appeals' decision is contrary to United States Supreme Court precedent, Petitioner is not entitled to relief on Claim (1).

### 3. *Chapman* Harmless Error

Because this Court concludes that there was no federal constitutional error made as to Claim (1), the Court cannot reach the harmless error question. Assuming for the sake of argument that this Court had determined there was a constitutional violation concerning the failure to testify, this Court agrees with Petitioner that the issue for harmless error review would not be simply whether Petitioner's testimony would have fit within the defense strategy chosen by his counsel, but it would encompass the totality of the evidence in the record, including that from the post-conviction hearings, to show everything available that counsel could have drawn from to formulate a defensive theory around Petitioner's proposed testimony. The totality of the evidence shows that the failure to testify not only was harmless, but that Petitioner's testimony likely would have

---

[11] Although the trial court eventually decided not to sentence Petitioner to death based on his mental health issues, Petitioner's proposed testimony may have contributed to a fixed life sentence, had Petitioner had an outburst on the stand during cross-examination or had he given the judge the impression that his history of violent outbursts, in which he regularly blamed the victim, showed that he could not be rehabilitated. Petitioner's counsel was not required to be clairvoyant, but simply choose the best strategy he could under the circumstances.

**MEMORANDUM DECISION AND ORDER - 38**

harmed either an acquittal defense or a lack-of-mens-rea defense. Accordingly, habeas corpus relief is not warranted on Claim (1), even under a harmless error analysis.

## DISCUSSION OF CLAIM (2)

Claim (2) is that Petitioner's lead trial counsel, John Adams, was ineffective in failing to adequately communicate with him. Petitioner alleges he sent his counsel 638 jail kites requesting meetings, information, and communication, but that his counsel did not respond to even one of his written requests. Consistent with these allegations, trial counsel testified that his written communications with Petitioner were very limited, but he gave the explanation that it was his policy not to give legal advice in writing or by telephone to incarcerated defendants. (State's Lodging C-8, pp. 155-156.) Petitioner testified that he did not have any substantial face-to-face communication with his counsel until a week or so before trial. Counsel testified that he could not remember how many times he visited Petitioner, but he assumed he would have visited him fairly often, given that the state was seeking the death penalty. (*Id*., p. 155.) Prior to representing Petitioner, counsel had handled "a couple dozen" death penalty cases and had never had a client sentenced to death. (*Id*., p. 150.)

As discussed above, Petitioner argues that he wanted to testify and use a mens rea defense to try to obtain a manslaughter conviction, rather than attempt acquittal and remain silent, but counsel would not listen to him or change the theory of the defense.

The Court earlier determined that the lack-of-communication claim was procedurally defaulted, but provided Petitioner with an opportunity to show cause and prejudice under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012), a narrow exception that

permits a petitioner to assert as "cause" a claim that his post-conviction counsel performed ineffectively in the initial post-conviction review proceeding. Therefore, the Court will now review in more detail the post-conviction proceedings.

To begin with, Petitioner's post-conviction counsel, Michael Palmer, performed adequately enough during the amendment phase of the post-conviction matter to avoid summary dismissal and merit an evidentiary hearing. Prior to the hearing, neither the State's attorney nor Palmer produced the file for Petitioner's trial counsel, John Adams, to review, even though it had been ten years since the trial. (See State's Lodging C-8, pp. 153-54.) When Adams testified, the only thing he had reviewed was a copy of the direct appeal opinion of the Idaho Court of Appeals. (*Id*., p. 154.)

This circumstance (the lack of Adams' personal files) tended to make it impossible for Adams to testify in detail about when he visited with Petitioner, what he advised Petitioner, and how often he communicated with Petitioner. Therefore, the only details in the record came from Petitioner, while Adams was able to testify only as to his general practices during representation of a client in a death penalty case. This circumstance actually made it easier for Palmer to assert that Adams had not communicated well with Petitioner. Palmer did not engage an attorney expert witness to testify about the standards for client communications in a death penalty case.

At the hearing, Petitioner admitted to meeting with Adams four times (though he argues three were simply for the purpose of introducing an expert witness who had arrived in town to meet with Petitioner at the jail), and meeting with Gresback and Adams' investigator at other times. (*Id*., p. 115.) The state district court found that this

**MEMORANDUM DECISION AND ORDER - 40**

amount of communication did "not fall below reasonable standards" and that Petitioner failed to show that "more or different communication would have altered the outcome in this case." (State's Lodging C-3, pp. 830-31.)

On post-conviction appeal, Petitioner's appellate counsel, Dennis Benjamin, a very experienced criminal defense attorney, omitted this claim, but he chose to pursue other claims on appeal, as well as bring a successive post-conviction action on the Sixth Amendment right to testify claim (discussed above). Here, Petitioner does not make a persuasive case that Palmer presented the lack-of-communication claim so poorly that Palmer prevented Benjamin from bringing the claim on appeal of denial of the post-conviction petition. Rather, there was simply no evidence to support a claim that more or different communications with Adams had a reasonable probability of changing the outcome of the trial, such that Palmer should have made a more thorough presentation in the post-conviction evidentiary hearing. Particularly, as described above, Petitioner's alternative theory would not have been a successful theory, and it might have exposed him to a greater chance of the death penalty than if he remained silent.

Therefore, Petitioner has not shown that Palmer was ineffective in the manner in which he presented this claim in the first post-conviction matter or that he made it impossible for Benjamin to pursue the claim on appeal. This was simply a poor claim that no attorney would have succeeded on, which means that, even if post-conviction appellate counsel's performance were covered by the *Martinez* exception (and it is not), then post-conviction counsel was not ineffective in omitting this claim from the appeal. *See Martinez*, 132 S.Ct. at 1320 (the narrow exception does not extend to the

**MEMORANDUM DECISION AND ORDER - 41**

performance of post-conviction appellate counsel). Petitioner has not shown adequate cause to excuse the default of this claim, and it is subject to dismissal with prejudice because of its procedural default. Alternatively, upon considering the merits of the claim on the basis set forth above, the Court concludes that, even if Petitioner felt that the minimal communication between counsel and client was inadequate, his defense suffered no prejudice.

## DISCUSSION OF CLAIM (3)

Claim (3) is that the state district court deprived Petitioner of his Fourteenth Amendment right to confront and adequately cross-examine three of the State's witnesses: (a) Rikki Bobo, Petitioner's fiancée; (b) Kenneth Thrift, Petitioner's drinking partner; and (c) Robert Agrifoglio, a jailhouse informant.

### 1. Cross-Examination of Rikki Bobo and Kenneth Thrift

#### A. Standard of Law re: Limiting Cross-Examination

"The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 315-316 (1974). A trial judge is permitted to impose reasonable limits on cross-examination, without violating a defendant's right to confrontation, based "on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Ardsall*, 475 U.S. 673, 679 (1986). In other words, "the Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and

to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (emphasis in original).

Challenges to a state trial court's evidentiary rulings are not cognizable on federal habeas review unless the admission or exclusion of evidence violated a petitioner's due process right to a fair trial. *Estelle v. McGuire*, 502 U.S. 62, 70 (1991). The Supreme Court has cautioned: "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).

### B. Discussion of Limitations on Rikki Bobo Cross-Examination

As mentioned above, Rikki Bobo, Petitioner's fiancée at the time, provided critical testimony for the State that showed Petitioner premeditated the killing of the victim and that he admitted the killing after it had occurred. Bobo was no stranger to legal trouble. The day before Bobo testified at Petitioner's trial, she was arrested and held in the Kootenai County Jail on several misdemeanor warrants for failure to appear and pay fines. (State's Lodging A-6, pp. 680-81.) In addition, she was facing a DUI prosecution and the potential loss of custody of her son.

Petitioner sought to challenge Bobo's credibility by eliciting testimony that she was currently jailed and showing that the State had provided her with "civilian clothing and make-up" for her trial appearance. (State's Lodging A-6, pp. 681-82.) The trial court refused to permit Petitioner to cross-examine Bobo on these subjects (*id.*, p. 683), but Petitioner was able to thoroughly cross-examine her on the fact that she signed an

**MEMORANDUM DECISION AND ORDER - 43**

immunity agreement with the State in exchange for her testimony at Petitioner's trial. (*Id.*, pp. 683, 731-37.)

The Idaho Court of Appeals relied on *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986), for the principle that "a trial court may reasonably limit cross-examination that is marginally relevant." (State's Lodging B-4, pp.11-12.) The appellate court concluded that the evidence about Bobo's incarceration at the jail was "at best, only marginally relevant," and that the court had discretion to omit it under Idaho Rule of Evidence 403 (even relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"). (State's Lodging B-4, p. 12.)

This Court agrees that the excluded evidence was only marginally relevant. The subjects upon which Bobo was cross-examined—immunity regarding her part in trying to cover up the crime at issue, leniency on her DUI charge and potential loss of her son, and her several interviews with police in which she told conflicting stories—were far more relevant and damaging than the weak evidence Petitioner was not able to bring in—that Bobo was incarcerated on a failure to appear or failure to pay fines, and that she was well-groomed because she had been provided clothing and makeup by the State.[12] The

---

[12] It is interesting to note that Petitioner had somewhat of a double standard for himself and his witnesses. He personally had undergone a substantial transformation in preparation for his appearance before the jury, from a heavy, long-haired, grisly-bearded biker look to a slimmed-down, clean-cut look, so much so that one witness had to repeat the first lines of his own testimony, because he was so shocked at Petitioner's changed appearance. Several others did not even recognize Petitioner and testified that he was not in the court room. Petitioner argues that, as a result of the excluded evidence of prior or current criminal activity, Bobo and Thrift were permitted to portray themselves as "upstanding citizens"; it is unclear how Petitioner himself would have shown that he was an

jury also heard extensively about the immunity agreement and its effect on Bobo's pending DUI charges directly from the prosecutor on her DUI case. Further, Bobo readily admitted in court that she had lied about the events surrounding the murder on several occasions. The jury had no reason to believe that Bobo was trouble-free, even though it did not know she was currently in jail and should have been clothed in jail garb, and it had every reason to believe she had personally gained by agreeing to testify. Whether the jury believed she fabricated her testimony was based upon its perception of her words, demeanor, and manner of testifying under examination and cross-examination. In addition, Petitioner was permitted to call the Director of Social Services for Shoshone County, who stated under oath that Bobo had "little or no reputation for truthfulness in our county." (State's Lodging A-6, p. 1618.)

On federal habeas review, the standard of law at issue is not simply *how the trial court applied state evidentiary law*, but whether the rulings violated Petitioner's due process rights under the United States Constitution. The Bobo omissions were not so relevant or serious that Petitioner's trial was unfair. The Due Process Clause is not implicated here. The Court concludes that Petitioner has not shown that the Idaho Court of Appeals' opinion is contrary to or an unreasonable application of *Delaware v. Van Ardsall*, because the information he was prohibited from bringing forward regarding Bobo was only marginally relevant, and he was permitted to cross-examine her on much more relevant and credibility-damaging information.

---

upstanding citizen, given his substantial criminal record and history of violent incidents, such that the jury would have credited his testimony over that of Thrift and Bobo.

**MEMORANDUM DECISION AND ORDER - 45**

## C. Discussion of Limitations on Kenneth Thrift Cross-Examination

Kenneth Thrift, nicknamed "Inbred" by Petitioner, was also a critical witness, providing testimony that Petitioner had threatened to kill the victim, that Petitioner was seen wiping the victim's doorknob with a bandana, and that Petitioner admitting to the killing after it occurred. Thrift was Petitioner's "drinking partner," who lived in the same boarding house as Petitioner. At trial, Petitioner wanted to impeach Thrift by drawing out testimony that he had been arrested 92 times and had 42 felony convictions.[13] The problem was that Thrift had kept himself crime-free for ten years, except for two DUIs. The trial court determined that the other felony convictions were too old to be admissible and that the recent DUIs did not bear on Thrift's credibility. (State's Lodging A-6, pp. 536-44.)

The trial court also found that Petitioner did not inform the State in advance that he intended to use Thrift's prior convictions that were more than ten years old. The court did not permit Petitioner to use the testimony, relying on Idaho Rule of Evidence 609(a), which prohibits the admission of a witness's prior convictions that are not relevant to credibility. The trial court also relied on Idaho Rule of Evidence 609(b), which prohibits the admission of all prior convictions that are more than 10 years old, unless: (1) the proponent gives adequate notice to the opposing party; (2) the probative value of the conviction is supported by specific facts and circumstances; and (3) the probative value substantially outweighs its prejudicial effect.

---

[13] Petitioner himself admitted that, on his own record, he had 43 arrests, but a "great percentage were dropped," and had 13 convictions, and so his quest to testify and best Kenneth Thrift as to credibility would not necessarily had borne fruit.

**MEMORANDUM DECISION AND ORDER - 46**

The trial court ruled that Petitioner could inquire into Thrift's motives for testifying, but he could not introduce Thrift's older crimes or his recent DUIs. (State's Lodging A-6, pp.539-540, 553-554.) On appeal, the Idaho Court of Appeals recognized the constitutional dimension of the claim, and held that the trial court's ruling was consistent with Idaho Rule of Evidence 609 and the United States Constitution. (State's Lodging B-4, pp.11-12.)

Respondent argues that Petitioner cannot show that the state court's ruling was contrary to, or an unreasonable application of, United States Supreme Court precedent, because the Supreme Court has never found a due process or Sixth Amendment violation in a situation where a trial court refused to permit a defendant to ask a witness about a past instance of criminal misconduct to challenge credibility.

Here, the Court assesses only whether the exclusion of the past criminal record of Thrift violated Petitioner's right to due process. Notably absent from the record is any showing made by Petitioner that the old felony convictions were of the type that their probative value outweighed the prejudice; nor can he show that "driving under the influence" violations bear on credibility. The reason for the evidentiary rule prohibiting convictions over ten years old is that ten years is a sufficient period of time for a person to have rehabilitated himself, and, thus, "[t]he probative value of a conviction over ten years old is outweighed by its prejudicial effect." *United States v. Estes*, 994 F.2d 147, 149 (5th Cir. 1993); *see also United States v. Cathey*, 591 F.2d 268, 275 (5th Cir. 1979) ("Congress intended that trial judges be extremely cautious in admitting evidence of remote convictions."); *State v. Miller*, 229 N.W.2d 762, 769-70 (Iowa 1975) (the

**MEMORANDUM DECISION AND ORDER - 47**

nearness or remoteness of a prior conviction is a factor of no small importance; even one involving fraud or stealing, for example, if it occurred long before and has been followed by a legally blameless life, should generally be excluded on the ground of remoteness).[14]

The Court concludes that Petitioner's due process rights were not violated by this exclusion of evidence. Because the Idaho Court of Appeals' opinion was not contrary to United States Supreme Court precedent, no habeas corpus relief is warranted on this claim.

### 2.  Admission of Preliminary Hearing Testimony of Robert Agrifoglio in the face of his refusal to give live testimony at trial

Petitioner also contends that the Idaho Court of Appeals made an unreasonable decision when it deemed harmless the trial court's admission of the preliminary hearing transcript of jailhouse informant Robert Agrifoglio, who decided not to testify at trial at the last minute on advice of counsel. At the preliminary hearing, Agrifoglio was called by the prosecution. He testified that, when he was incarcerated at the Latah County Jail, Petitioner told him about the crime and said that "if he thought there were any other witnesses, . . . he would take care of them." (State's Lodging A-6, p.1373).

Agrifoglio had a number of details that matched other witnesses' versions of the crime. The level of close or exact detail included the following: "that the old man [Smith] had left some notes or something on his door and made some threatening comments to

---

[14] Also problematic for Petitioner's argument is that he failed to give "the adverse party sufficient advance written notice of intent to use such evidence so as to provide the other party with a fair opportunity to contest such use." *See* 2 Wharton's Criminal Evidence § 9:32 (15th ed.). Petitioner has not provided adequate excuse for the failure of his counsel to give the State notice of the convictions sought to be used and the reasons they should have been permitted, notwithstanding their age. In short, fair play goes both ways, and the trial court was justified in disallowing the evidence for lack of notice.

**MEMORANDUM DECISION AND ORDER - 48**

him"; "that he took the matter into his own hands"; that "he hit him with a large axe"; that the old man "lived either across the hall or next door"; that Petitioner and some friends "had been partying or something for four or five days or a weekend"; that the note on the door said "that they were disturbing him or something uh, the other – other tenants"; that Petitioner was "concerned that the – the federal investigator doing the PSI, or the pre-sentence investigate [sic] for [the federal gun charge] would find out somehow and, uh, he might be sentenced a little harsher"; that Rikki Bobo was Petitioner's girlfriend and she was involved with the prosecution in the federal gun charges; that the body was found by the building supervisor who unlocked the locked door and found the old man on the floor; and that everyone was confused because the door had been locked and nothing was missing from the man's room. (State's Lodging A-6, pp. 1363-1425.)

At the preliminary hearing, Petitioner's counsel cross-examined Agrifoglio extensively about his conversations with Petitioner at the jail; his motives for testifying, including whether he was receiving a benefit, such as being housed in a county jail instead of prison; and his prior convictions. (State's Lodging A-6, pp.1363-1425.)

The prosecution intended to call Agrifoglio as a trial witness, but the courtroom bailiff reported that Agrifoglio had told the jailers that he refused to testify. The judge required Agrifoglio to appear in court, and he was questioned outside the presence of the jury regarding whether he would testify. Agrifoglio said he would not testify, even though he was not concerned about incriminating himself; rather, his Arizona attorney had advised him not to testify. Counsel, the court, and Agrifoglio discussed that a

contempt finding would likely not act as an incentive for him to testify, because he was already imprisoned. (State's Lodging A-6, pp.1007-1010, 1347-1348.)

The trial court appointed an Idaho attorney for Agrifoglio, who later reported to the court and counsel:

> Your Honor, I have met with Mr. Agrifoglio, and he informs me that under the present circumstances that now exist, he will not testify in this courtroom. He does not have, in my opinion, a lawful basis to assert Fifth Amendment protection. Notwithstanding, he recognizes the circumstances in which he finds himself as a state prisoner, and *he also recognizes the power of this Court to the extent that it could exert that power. Notwithstanding, he chooses not to testify.*

(State's Lodging A-6, p. 1003 (emphasis added).) As a result, the trial court deemed the witness unavailable, and allowed the prosecution to read the preliminary hearing transcript into the record. (State's Lodging A-6, pp.1347-1350, 1363-1425.)

The Idaho Court of Appeals determined that because the trial court simply *deemed* Agrifoglio unavailable without actually ordering him to testify, the trial court admitted the preliminary hearing transcript testimony in error, pursuant to Idaho Rule of Evidence 804(a)(2), and in reliance on case law from the United States Courts of Appeals for the Second and Seventh Circuits. (State's Lodging B-4, pp. 14-15.) Nevertheless, the Idaho Court of Appeals found the error harmless because (1) the Agrifoglio testimony added only a few additional details to other witnesses' testimony about how Smith was killed, (2) "its effect was almost entirely corroborative of testimony given by previous witnesses," and (3) it "added little more than a small amount of weight to the massive quantity of evidence of Barcella's guilt that was already before the jury." (*Id.*, p. 16.)

Like the right-to-testify claim, United States Supreme Court precedent governing prior testimony of unavailable witnesses is not as demanding as state evidentiary law. In *Barber v. Page*, 390 U.S. 719 (1968), the Supreme Court held that the Confrontation Clause forbids the introduction into evidence of the transcript of testimony taken at a preliminary hearing in the same case, where the defendant did not cross-examine the witness at the preliminary hearing, and the prosecution made no effort whatsoever to obtain the presence of the witness at trial. Rather than having a strict requirement that a court order is necessary to declare a witness "unavailable," the rule is different for Confrontation Clause purposes—the witness may be declared unavailable if the "prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (quoting *Barber v. Page*, 390 U.S. 719, 724–25 (1968)), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36, 68 (2004)). "The lengths to which the prosecution must go to produce a witness ... is a question of reasonableness." *Roberts*, 448 U.S. at 74. "The law does not require the doing of a futile act. But if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith may demand their effectuation." *Id.* The prosecution bears the burden of establishing that a witness is unavailable. *Id*.

To dispose of the Confrontation Clause claim, the Idaho Court of Appeals relied on a state evidentiary standard and federal circuit court precedent. Because the claim was adjudicated on the merits, the Court affords AEDPA deference to the Idaho Court of Appeals' decision that Petitioner is not entitled to relief and now determines whether the decision was contrary to United States Supreme Court precedent.

**MEMORANDUM DECISION AND ORDER - 51**

The record reflects that the prosecution and trial court went to great lengths to bring Agrifoglio to court, question him on his intent, inform him of the law, and appoint an attorney to give him advice. It is clear from the record that Agrifoglio knew that the court could hold him in contempt, but nevertheless chose to refrain from testifying. Contempt would have been ineffective because he was already incarcerated. Therefore, the Court concludes the prosecution made sufficient efforts to secure the witness's presence for trial, and "ordering" him to appear and testify would have been futile and was unnecessary to declare him "unavailable." Because Petitioner's lead attorney cross-examined Agrifolio extensively on a wide range of relevant topics during the preliminary hearing, Petitioner's Confrontation Clause rights were protected under the circumstances. Therefore, this claim does not warrant relief.

The Court also agrees that, even assuming for the sake of argument that the Confrontation Clause was violated, the error was harmless. The result is the same even when considering the related asserted error that the trial court refused to allow Petitioner to impeach Agrifoglio's preliminary hearing testimony with allegedly inconsistent statements that it sought to admit through Kootenai County Public Defender's Office Investigator Mark Durant).[15] (State's Lodging B-4, pp.15-16.)

The harmless error rule arises from the principle that a defendant is entitled to a fair trial, but not a perfect one. *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986). The

---

[15] The Idaho Court of Appeals concluded that, under Idaho Rule of Evidence 806, the trial court erroneously prevented Petitioner from presenting testimony from Investigator Durant that Agrifoglio told Durant he felt he was being pressured and threatened with harder prison time to force him to testify. Durant also wanted to testify that he asked Agrifoglio if he had testified truthfully at the preliminary hearing, and Agrifoglio replied that he would "take the Fifth on that." (State's Lodging B-4, pp. 5-6.)The Idaho Court of Appeals included this error in its harmless error analyses, and, therefore, this Court will do so as well, due to the related nature of the claim.

MEMORANDUM DECISION AND ORDER - 52

United States Supreme Court has clarified that, when a state appellate court has undertaken a harmless error review under *Chapman v. California*, 386 U.S. 18 (1967), the federal district court reviewing the decision under § 2254 applies the harmless error analysis under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Fry v. Pliler*, 551 U.S. 112, 120 (2007) ("*Brecht* obviously subsumes AEDPA/*Chapman* review"). Under *Brecht*, a federal habeas court that determines constitutional error occurred cannot grant a writ of habeas corpus unless the error "had substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638. Under the *Brecht* harmlessness analysis, "if a judge is in grave doubt" about the effect of the error on the jury, the petitioner must prevail. *O'Neal v. McAninch*, 513 U.S. 432, 438-39 (1995).

Factors to consider regarding errors in limiting witness testimony include: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Van Arsdall*, 475 U.S. at 684.

The Court agrees that Agrifoglio's testimony mirrored what the other witnesses said as to how and why the crime was committed. Three other witnesses (Thrift, Bobo, and Lane) testified that Barcella had confessed the murder to them (State's Lodging A-6, pp.571-576, 693-699, 1181-1184). Four other witnesses testified that Petitioner was upset by Smith's instructions to remove the offensive door sign or to otherwise behave himself in the Harmony House (Thrift, Smeltzer, Bakie, and Lane).

**MEMORANDUM DECISION AND ORDER - 53**

Through the reading of the transcript in open court, the jury was able to hear and consider the very extensive cross-examination of Agrifoglio by Petitioner's counsel at the preliminary hearing. The jury knew that Agrifoglio was incarcerated and had escape and burglary convictions. (State's Lodging A-6, p.1364.) The state trial court also permitted Petitioner to put on a Latah County Jail Sergeant, James Loyd, who testified that he found Agrifoglio to be less than truthful. (State's Lodging A-6, p. 1572.) Petitioner also called an expert witness on jailhouse informants, Dr. Danny Smith, who testified how jailhouse informants often obtain their information from other sources and then come into court acting as if the defendant had confessed to them. (*Id.*, pp. 1512-13.)

While the Agrifoglio testimony added to the weight of the testimony of the other witnesses and corroborated them, it added nothing unique. For example, if that were the only confession in the case or the only statement of motive, the inclusion of the testimony would not have been cumulative. However, Agrifoglio's version was just more of the same. Because of the great weight and duplicative nature of the other evidence, the Court is convinced that the inclusion of the Agrifoglio preliminary hearing testimony, and the absence of Durant's testimony to rebut it, did not have a "substantial and injurious effect or influence in determining the jury's verdict." 507 U.S. at 638.

### 3.  Summary

Petitioner is not entitled to relief on Claim (3). First, his rights to cross-examine Bobo and Thrift were not curtailed in a manner that violated the Confrontation Clause. Second, allowing the preliminary hearing testimony of Agrifoglio to be read to the jury did not violate the Confrontation Clause. Third, even assuming that the preliminary

MEMORANDUM DECISION AND ORDER - 54

hearing testimony should not have been read into the record for the jury's consideration, the error was harmless. Relief is not warranted on any aspect of this claim.

## DISCUSSION OF CLAIM (4)

Claim (4) is that Petitioner's Fourteenth Amendment rights were violated when the prosecution elicited testimony from George Lane as follows:

Q.   Did the defendant ever tell you whether he believed he was going to
     be convicted or not?

A.   He said he wouldn't be.

Q.   Did he say why he wouldn't be.

A.   Uhm, probably because he had had a couple other shootings under
     his belt and he was never convicted.

(State's Lodging A-6, p. 1184.)

Before trial, Petitioner had filed a motion in limine to exclude his prior felony convictions and prior bad acts from being introduced at trial. The court refused to issue a blanket order, but advised the parties that if they were aware of any testimony or other evidence that would fit within the scope of Rule of Evidence 404(b), they should bring it up at trial to be discussed outside the presence of the jury. Although both parties had a copy of Lane's written statement where he had mentioned the inadmissible information about the prior shootings, neither party brought it up in advance to the court. The prosecutor did not counsel Lane before trial not to make the statement. The prosecutor explained that the question he had asked at trial was designed to elicit the same response to the question that was contained in the written statement—"because nobody could

prove I was in that apartment"—not the shooting information. (State's Lodging A-6, p. 1187.)

After Lane's comment and after hearing argument from counsel, the trial court denied Petitioner's motion for a mistrial and instead ordered the testimony stricken from the record and ordered the jurors to disregard it entirely. (*Id*., pp. 1216-1223.) In support of its decision, the trial court noted that Petitioner's counsel had mentioned in his opening statement, "You are going to hear that Gerry, sure, has had some trouble with the law in the past"—although that statement was in reference to Petitioner's recent conviction for felon in possession of a firearm, not in reference to any shootings. (*Id*., p. 269.) Petitioner later argued that the attorney's opening statement was not evidence and should not have been relied upon by the trial court.

On appeal, the Idaho Court of Appeals affirmed the trial court's denial of Petitioner's motion for a mistrial. (State's Lodging B-4, pp.6-9.) Although the State conceded on appeal that Lane's statement was improper under Rule 404(b), the Court of Appeals concluded that the statement was harmless error under the *Chapman* standard:

> Lane was the state's twentieth witness. Prior to his testimony, the jury had been told by the defense that Barcella had a prior felony conviction. The jury heard testimony from bartender Smeltzer, bar patron Bakie, and Thrift, that Barcella had told them he intended to kill Smith. The jury also heard testimony from Thrift, Bobo and Lane that Barcella admitted to killing Smith. Thrift and Bobo testified that Barcella owned a pulaski. Thrift also testified that he saw Barcella wiping off Smith's doorknob with a bandana when Thrift came out of his room the night Smith was killed. Bobo testified that the pulaski was missing from Barcella's room the next day. A pulaski was recovered from under the bed in Smith's room.

(State's Lodging B-4, p.9.)

**MEMORANDUM DECISION AND ORDER - 56**

Because the state court reached a decision on the merits, the Court must first determine whether clearly-established law exists to govern the claim of whether the trial court should have granted a mistrial over Lane's inadmissible statement made to the jury. Case law from the United States Supreme Court on the subject of mistrial is not similar to Petitioner's claim but tends to address Double Jeopardy Clause concerns—whether, after a mistrial was *granted*—a defendant can be retried. *See United States v. Perez*, 9 Wheat. 579, 6 L.Ed. 165 (1824) (retrial after discharge of a deadlocked jury, even if the discharge occurs without the defendant's consent, does not violate double jeopardy); *Arizona v. Washington*, 434 U.S. 497, 503 (1978) ("the constitutional protection [against double jeopardy] embraces the defendant's valued right to have his trial completed by a particular tribunal").

The general legal principle that can be derived from these cases is that trial judges may declare a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity" for doing so, or a "high degree of necessity." *Renico v. Lett*, 559 U.S. 766, 773-74 (2010) (citing *Perez*, 9 Wheat. at 580, and *Washington*, 434 U.S. at 506). In addition, the Supreme Court explained that "the decision to declare a mistrial is left to the 'sound discretion' of the judge, but 'the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes.'" *Renico*, 559 U.S. at 774 (quoting *Perez*, 9 Wheat. at 580).

As to general due process law, not particularly on the topic of mistrial, the United States Supreme Court has held that prejudicial comments that "so infect[] the trial with unfairness . . . make the resulting conviction a denial of due process." *Donnelly v.*

**MEMORANDUM DECISION AND ORDER - 57**

*DeChristoforo*, 416 U.S. 637 (1974) (prosecutor's remark during closing argument was no so prejudicial that it deprived defendant of a fair trial). A reviewing court's task is to determine whether the comment was "too clearly prejudicial for [] a curative instruction to mitigate their effect, by reviewing the facts, including the curative instruction. *Id.* at 644. In *Donnelly*, the Court pointed out the difference between "egregious" errors that warrant reversal of a conviction—such as the knowing use of false evidence, for example, showing a pair of the defendant's paint-stained underpants to the jury and suggesting that the stains were blood or committing a *Brady* exculpatory evidence violation,[16] and "ordinary trial error." *Id.* at 647-48.[17]

The court will assume for the sake of argument that *Renico* and *Donnelly* amount to clearly-established law that applies to Petitioner's claim that a mistrial should have been granted when Lane made the inadmissible remark. Therefore, the question is whether the state appellate court's decision on the merits is contrary to *Renico* and *Donnelly*.

Because a large amount of evidence showed that Petitioner voiced his animosity toward Smith and his intention to kill Smith, that Petitioner killed Smith with Petitioner's pulaski, that Petitioner told others that he killed Smith, and that Petitioner made several efforts to cover up his involvement in the crime—the Court concludes the fact that the jury heard Petitioner had "a couple of other shootings" in some unknown and unrelated

---

[16] *See Miller v. Pate*, 386 U.S. 1 (1967), and *Brady v. Maryland*, 373 U.S. 83 (1973).

[17] To the extent Petitioner is arguing that the state court erred in applying the state laws concerning the granting of a mistrial, such a claim is not cognizable in a federal habeas corpus proceeding. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) (a federal habeas court cannot re-examine state-court determinations on state-law questions).

**MEMORANDUM DECISION AND ORDER - 58**

context did not constitute "urgent circumstances," nor did it "infect the trial with unfairness." Rather, it was ordinary trial error that would have been more prejudicial if it had addressed some critical contested fact in the case or if it had not been surrounded by substantial evidence from many different sources of Petitioner's guilt. Relief is not warranted on this claim, because the error is not of a constitutional magnitude. And, because no constitutional error occurred, the Court need not review the state court's harmless error decision, nor engage in a harmless error review of its own.

### DISCUSSION OF CLAIM (5)

Claim (5) is that Petitioner's Fourteenth Amendment rights were violated when the prosecution did not disclose until trial the full transcript of a police interview with Rikki Bobo. The record shows that the prosecution provided an audiotape of Side 1 and Side 2 of Bobo's interview to defense counsel John Adams, along with a printed transcript of Side 2 only. The transcript was undated, and it began, oddly, with "Now, how did Shelley's husband die?" (which might have given the parties a clue that some prior context was missing). (State's Lodging A-6, p. 981.) Neither party seemed to realize that half of the written transcript was missing. In the midst of trial, when the parties were having difficulty identifying the date of that particular interview while questioning Bobo, a sergeant went to his office during the trial to determine why the transcript was undated, and then discovered only half the transcript had been provided. Petitioner's counsel argued that this omission had been intentional or that the prosecutor was not truthful about when the error had been discovered, because the prosecution previously had provided Petitioner's counsel in the federal felony firearm case with the full written

transcript. The prosecutor argued that Adams had been provided with the full audiotape, but only half the transcript, and so, technically, the whole interview had been disclosed to the defense during discovery.

When the parties disclosed the omission to the trial court, the court and both counsel carefully went through the omitted part of the interview line by line to determine whether its content showed something new and different that would impact Petitioner's defense. (State's Lodging A-6, pp. 987-998.) Nothing substantial was contained in the missing pages. The court denied the request for a mistrial, and instead offered Petitioner the opportunity to recall Bobo as a witness to go over the newly-revealed transcript. (*Id.*, p. 1001.) Adams declined to do so, and instead entered into a stipulation with the prosecutor regarding one point that was to be read to the jury: "when Rikki Bobo arrived at Denny's on the morning of April 3, 1995, Gerald Barcella and Kenneth Thrift were eating and a waitress took their plates around 7 a.m.; that is an established fact in this case." (State's Lodging A-6, pp. 130.)

While defendants have no general constitutional right to discovery in criminal proceedings, *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), due process requires that the prosecution disclose evidence favorable to an accused upon request, when such evidence is material to guilt or punishment, including impeachment material. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Giglio v. U.S.*, 405 U.S. 150 (1972). "Material" evidence is any evidence for which there is a reasonable probability that its disclosure would have changed the outcome of the proceeding, and a "reasonable probability" means one sufficient to undermine confidence in the outcome. *United States v. Bagley*,

MEMORANDUM DECISION AND ORDER - 60

473 U.S. 667, 682 (1985). There are three components of a *Brady* violation: (1) the

evidence at issue must be favorable to the accused; (2) the evidence must have been

suppressed by the state, either willfully or inadvertently; and (3) prejudice must have

ensued. *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

The United States Supreme Court has not spoken on the precise issue of *late-

disclosed* discovery. However, for purposes of gauging the reasonableness of the state

court's decision in this case, this Court looks to lower federal court rulings that late

disclosure of *Brady* material does not constitute a *Brady* violation and will not result in

sanctions unless the defendant can show that the delay denied him a fair trial. *See, e.g.*

*United States v. Blood*, 435 F.3d 612, 627 (6th Cir. 2006); *U.S. v. Perez–Ruiz*, 353 F.3d

1, 8–9 (1st Cir. 2003).

Here, Petitioner has cited to no prejudice that occurred as a result of the cure

offered by the trial court. On appeal, he argued only that "Bobo had already testified and

the cross-examination regarding the testimony contained in the twenty-seven pages of the

transcript would be taken out of the context of the overall cross-examination, thereby

reducing its effectiveness," but no specific prejudice has been identified. (State's Lodging

B-1, p. 33.) Petitioner's counsel made a decision to single out only one fact from the

missing transcript pages to use in Petitioner's defense. While it is unclear whether the

prosecution's error was inadvertent or intentional, it was discovered in time to be

corrected. Petitioner declined a complete remedy and opted for one stipulated fact.

Hence, no mistrial was necessary. No relief is warranted on this claim because the Idaho

Court of Appeals' opinion is not contrary to, or an unreasonable application of, *Brady* and its progeny.

## DISCUSSION OF CLAIM (6)

Claim (6) is that Petitioner's Fourteenth Amendment rights were violated when the trial court denied his motion for a new trial. The Idaho Court of Appeals listed Petitioner's grounds for a new trial as follows:

> Lane's blurt about Barcella having shot two people in the past and gotten away with it, the late disclosure of the first twenty-seven pages of Bobo's statement to the police, the admission of Agrifolio's preliminary hearing testimony, the trial court's preclusion of Durant's impeachment of Agrifolio's preliminary hearing testimony, and the court's refusal to allow Barcella to inquire into Thrift's record of prior arrests to impeach him for lack of truthfulness.

(State's Lodging B-4, pp. 4-5.)[18]

The Idaho Court of Appeals reviewed each claim individually, and then cumulated the three evidentiary issues determined to be erroneous: "Lane's blurt about two prior shootings, the admission of Agrifolio's preliminary hearing transcript based upon unavailability, and the exclusion of Durant's testimony concerning Agrifolio's unsolicited phone calls to impeach his preliminary hearing testimony." (State's Lodging B-4, p. 17.) The Court of Appeals concluded:

> [A]nalysis of these three errors, in light of the full record, leads to the conclusion that, even without the erroneously admitted evidence, there is overwhelming evidence of Barcella's guilt. Thus, we are confident, beyond a reasonable doubt, that the cumulative effect of these errors did not

---

[18] In the state district court, Petitioner had raised several other grounds as the basis for the motion for a new trial, including that the prosecution "persevered in attempting to elicit evidence of 'unduly prejudicial bad acts' of the defendant and evidence of defendant's character" and "the prosecutor's closing argument," but these additional grounds were either omitted on appeal or not found to be error, and, hence, are not included in this action. (State's Lodging A-4, pp. 622-23.)

**MEMORANDUM DECISION AND ORDER - 62**

> contribute to Barcella's conviction or otherwise affect his substantial rights. The jury would have reached the same result regardless.

(State's Lodging B-4, p. 17.)

Like the mistrial claim discussed above, federal circuit courts rely on a general due process theory to determine whether state court trial error that could have prompted a new trial amounts to a federal due process violation, based on *Donnelly v. DeChristofo*, 416 U.S. 637 (1974), *Estelle v. McGuire*, 502 U.S. 62, 75 (1991); and *Lisenba v. California*, 314 U.S. 219 (1941). The Ninth Circuit has equated the *Donnelly* "so infected the trial with unfairness" standard with the *Brecht* "had a substantial and injurious effect" standard. *Thomas v. Hubbard*, 273 F.3d 1164, 1179-80 (9th Cir. 2002), *overruled on other grounds by Payton v. Woodford*, 299 F.3d 815 (9th Cir. 2002),[19] although the United States Supreme Court has not done so.[20]

In handling mistrial claims on habeas corpus review, lower federal courts have merged due process analysis with harmless error analysis, and also with cumulative error analysis if the motion for a new trial is based upon multiple errors. Particularly, if a single state-law error rises to the level of a due process violation, it is deemed a sufficiently harmful error to warrant relief; if several state-law errors actually occurred (and are not simply *alleged* errors), then they can be cumulated to determine whether they amount to a

---

[19] *Payton v. Woodford* was itself overruled on other grounds by *Woodford v. Payton*, 538 U.S. 975 (2003).

[20] A motion for new trial is a creature of state criminal procedure, and lower federal courts agree that, framed simply as a claim for the denial of a motion for a new trial, such a claim is not cognizable on federal habeas corpus review. *See, e.g., Ford v. Pliler*, 99 F. App'x 766, 767 (9th Cir. 2004) ("Ford argues that the California courts deprived him of his right to present evidence that would have raised a reasonable doubt about his guilt, but he has not identified any Supreme Court precedent that required the state trial court to grant him a new trial."); *Haygood v. Quarterman*, 239 F. App'x 39, 42 (5th Cir. 2007); *Roberts v. Cain*, 2015 WL 7080546, at *6 (E.D. La. 2015); *Rodriguez v. Warden, S. Ohio Corr. Facility*, 940 F. Supp. 2d 704, 711 (S.D. Ohio 2013).

federal due process violation, which, again, would amount to a sufficiently harmful error

to warrant habeas relief. *See Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007).

> In *Parle*, the Ninth Circuit explained:

> In evaluating a due process challenge based on the cumulative effect of multiple trial errors, a reviewing court must determine the relative harm caused by the errors. If the evidence of guilt is otherwise overwhelming, the errors are considered "harmless" and the conviction will generally be affirmed. The "logical corollary" of this harmless error doctrine is that trial errors are more likely to be prejudicial to a defendant—*i.e.*, *not* harmless— when the government's case on a critical element is weak. Accordingly, in determining whether the combined effect of multiple errors rendered a criminal defense "far less persuasive" and had a "substantial and injurious effect or influence" on the jury's verdict, the overall strength of the prosecution's case must be considered because "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."

505 F.3d at 927-28 (9th Cir. 2007) (citations omitted).

Because Claim (6) (denial of the motion for new trial) is, therefore, factually and

legally the same as Claim (11) (cumulative error), Claim (6) is discussed within the

context of Claim (11), below.

## DISCUSSION OF CLAIM (11)

Claim (11) is that the cumulative effect of the evidentiary errors at trial violated

Petitioner's Fifth, Sixth, Eighth,[21] and Fourteenth Amendment rights. Under the

cumulative error doctrine, even though several trial court errors in a criminal trial may be

harmless alone, if their combined effect renders the trial fundamentally unfair, then due

---

[21] The Eighth Amendment applies only after conviction. *See, e.g., Whitley v. Albers*, 475 U.S. 312, 318 (1986) (The Eighth Amendment was designed to protect those convicted of crimes and consequently the Clause applies only after a criminal prosecution is completed).

**MEMORANDUM DECISION AND ORDER - 64**

process is violated. *Chambers v . Mississippi*, 410 U.S. 284, 290, 298-303 (1973). In such a case, the totality of the errors must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Stated differently, due process is offended where the effect of the cumulative errors renders a criminal defense "far less persuasive than it might have been" without the errors. *See Chambers*, 410 U.S. at 294.[22]

As one court applying this doctrine observed:

"Cumulative error" is an infinitely expandable concept that, allowed to run amok, could easily swallow the jurisprudence construing the specific guarantees of the Bill of Rights and determining minimum standards of procedural due process. Under its aegis, an error that would not have risen to constitutional dimension by itself might suddenly, when aggregated with other non-constitutional errors, become worthy of habeas relief.

* * *

Equally important, granting habeas relief from state convictions for aggregated non-constitutional errors may too easily conflict with established limits on the scope of federal habeas relief.

*Derden v. McNeel*, 978 F.2d 1453, 1457-58 (5th Cir. 1992).

Federal habeas corpus relief must be based on precedent from the United States Supreme Court (*Donnelly*, *Chambers*, *Estelle*), and not any particular test set forth by the Ninth Circuit (*Parle* or *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990)). Therefore, the Court reviews the cumulative error claim under Supreme Court precedent, using

---

[22] There is no clearly established United States Supreme Court precedent addressing the cumulative error doctrine as grounds for federal habeas corpus relief. The argument that no on-point Supreme Court precedent should result in denial of Mr. Parle's claim was rejected by the federal district court and by the Ninth Circuit Court of Appeals. *See Parle v. Runnels*, 2002 WL 2012639 , at *21(N.D. Ca. 2002); *Parle v. Runnels*, 505 F.3d 922 (9th Cir. 2007). Here, this Court follows the Ninth Circuit, but notes the gap in the law.

**MEMORANDUM DECISION AND ORDER - 65**

*Parle* only as a gauge in this Court's overall determination of whether the Idaho Court of

Appeals' decision rejecting Petitioner's cumulative error claim was unreasonable.

In *Chambers*, the defendant, Mr. Chambers, was charged with shooting a police

officer; however, one witness, Mr. McDonald, signed a sworn written confession that he

killed the officer, but then recanted at a subsequent hearing. When McDonald was called

as a witness at trial—where Chambers' defense was that McDonald was the shooter—the

state court refused to allow Chambers to treat McDonald as an adverse witness and cross-

examine him about his repudiated confession. 410 U.S. at 287-92. The trial court also

excluded as inadmissible hearsay the testimony of three witnesses that McDonald had

confessed to them individually that he was the shooter. *Id*. at 292–93. Cumulating these

evidentiary errors, the United States Supreme Court held that the state trial court had

"denied [Chambers] a trial in accord with traditional and fundamental standards of due

process." *Id*. at 302.

In *Parle*, Mr. Parle killed his wife, and there was much evidence at trial about their

mutual combat prior to the killing. The Ninth Circuit Court summarized the errors and

effect as follows:

> A unique and critical thread runs through the trial errors in this case: all of
> the improperly excluded evidence in Parle's case—i.e., expert testimony
> about the effects of a bipolar manic episode on one's state of mind, the
> victim's previous threats and history of violence, and Parle's father's
> testimony about Parle's appearance and demeanor immediately before and
> after the crime—supported Parle's defense that he lacked the requisite state
> of mind for first-degree murder; at the same time, all of the erroneously
> admitted evidence—i.e., Parle's psychiatrist's testimony in violation of
> privilege about Parle's minor bipolar disorder and relative stability in
> treatment, and evidence of Parle's violent threats to a police officer—
> undermined Parle's defense and credibility and bolstered the State's case.

**MEMORANDUM DECISION AND ORDER - 66**

> The combined effect of these errors, like those in *Chambers*, rendered Parle's defense "far less persuasive than it might have been," *id*. at 294, 93 S.Ct. 1038, and therefore had a "substantial and injurious effect or influence on the jury's verdict," *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710, violating Parle's due process rights. And, given the plainly one-sided prejudice resulting from these errors and their direct relevance to the only contested issue before the jury, the state court's conclusion to the contrary was objectively unreasonable.

*Parle v. Runnels*, 505 F.3d 922, 930 (9th Cir. 2007). Parle was granted federal habeas corpus relief. *Id*. at 935.

As noted above, among the errors alleged by Petitioner, the Idaho Court of Appeal concluded that three were actual errors—Lane's blurt about two prior shootings, the admission of Agrifoglio's preliminary hearing transcript based upon unavailability, and the exclusion of Durant's testimony concerning Agrifoglio's unsolicited phone calls to impeach his preliminary hearing testimony. The most obvious difference between these errors and those in *Chambers* and *Parle* is that the Lane error was on a peripheral issue,[23] and the two Agrifoglio errors related to a peripheral witness—a person who had not been with Petitioner during the time period surrounding the threats, the killing, and the attempts to cover up the killing. None of these errors went to exculpatory evidence, as in

---

[23] The facts of Petitioner's case, where he was accused of killing the victim with an axe-like tool, and not a gun, are nothing like the facts in *U.S. v. Hitt*, 981 F.2d 422 (9th Cir. 1992), where the defendant was accused of possessing an unregistered machine gun—which was actually a semiautomatic rifle that he allegedly had altered to discharge more than one shot at a time—and the prejudicial evidence that was permitted was a photograph of the gun alongside six regular guns, three assault rifles, and several knives, which appeared to belong to the defendant, but which actually belonged to his roommate. Firearms evidence, the court reasoned, can have a visceral effect on the jury, because "[r]ightly or wrongly, many people view weapons, especially guns, with fear and distrust." *Id*. at 424. In *Hitt*, the very substance of the crime charged was whether the defendant possessed an unregistered machine gun, and the case was especially close: "An expert on one side claimed the gun fired more than one shot per trigger pull; an expert on the other (corroborated by two police officers) said it didn't." The court concluded that the error was not harmless because the "photograph may well have made the difference between acquittal and conviction." *Id*. at 425. In Petitioner's case, even with the discussion of his contemporaneous illegal firearms arrest and conviction, a gun was not a central issue in the case, and Petitioner admits that he himself desired to testify that he had shot two other people. Because of the large amount of evidence that Petitioner killed the victim with an axe, the effect of Lane's blurt was minimal, even when cumulated with the Agrifoglio evidence.

*Chambers*. The Agrifoglio testimony went to the issue of mens rea—a key element of the crime—but it added nothing unique and was entirely duplicative of what several other witnesses reported that Petitioner said, as opposed to the varied information excluded in *Parle*.

The omission of the Durant testimony showed only an inference that Agrifoglio refused to testify at trial because he had lied during the preliminary hearing—and Agrifoglio was cross-examined so extensively at the preliminary hearing by Petitioner's attorney (plus his credibility and motive was called into question by two other witnesses at trial)—that the jury had plenty of evidence before it to determine whether he had told the truth at the preliminary hearing. In addition, because the Agrifoglio testimony almost exactly matched that of the other witnesses, he could not have been easily impeached by an investigator testifying that Agrifoglio had implied that he had lied—because there are few ways he could have come up with the same facts. Petitioner's expert witness testified about how jailhouse informants obtain their information; thus, the jury had every reason to question whether Agrifoglio had testified falsely simply to obtain a benefit for himself.

The jury likely came down to weighing whether Petitioner had indeed told Agrifoglio the facts, or whether Agrifoglio had obtained the facts from sources such as news stories or police reports (in other words, they may have questioned whether Agrifoglio's story was simply a recycled version of the stories of eyewitnesses—which nullifies but does not necessarily *render untrue* the facts Agrifoglio testified to). Often the value of a jailhouse informant to a case is that he is the only person who claims that

the defendant admitted the crime to him; here, in contrast, Petitioner told two trusted acquaintances that he killed Smith, *and* he solicited their help to cover up the crime.

In this Court's opinion, it cannot be said that the errors in this case caused Petitioner's defense to be *far less persuasive* than it would have been—either under the theory presented at trial or under the mens rea defense preferred by Petitioner. The largest difference between this case and *Chambers* and *Parle* is that the prosecution had a mountain of evidence to support the elements of the crime in this case. Beyond what Lane blurted out and Agrifoglio testified to, there is simply too much other evidence in the record pointing to Petitioner's plan, his awareness of the killing, his carrying out of his plan to kill the victim, his contemporaneous reporting of the killing in a manner that indicated a feeling of satisfaction, and his acts in attempting to hide his participation in the crime. Even though Petitioner does, in fact, have mental health issues, as do many law-abiding citizens in today's society, Petitioner did not speak or act in accordance with how one would have acted who was unaware of, or mistaken about, committing the killing of Smith. Based on the totality of the record, the Court concludes that the Idaho Court of Appeals' cumulative error analysis is not contrary to United States Supreme Court due process precedent, and, thus, habeas corpus relief is not warranted on Claim (11).

## SUMMARY AND CONCLUSION

Federal habeas corpus presents an extremely narrow avenue to relief from a state court judgment. After reviewing Petitioner's entire case, this Court is convinced that nothing Petitioner has argued would have made a difference under any federal legal

formulation. The facts show that Petitioner killed Smith with enough awareness to constitute intent and malice. Even though Petitioner is very adamant in his belief that he is entitled to relief as a result of the alleged and actual errors in his trial proceedings, the entire record reflects otherwise (even considering the additional alleged errors noted in the record but not particularly mentioned in this Order).

While the outcome is undoubtedly disappointing for Petitioner, the Court has made every effort to study the record and fully explain why relief is not warranted. Petitioner's case is reminiscent of this truism from C.S. Lewis: "What you see and what you hear depends a great deal on where you are standing."[24] From where Petitioner is standing, he is unable to see the record in an objective manner. Based on the reasoning set forth above, the Petition will be denied and dismissed with prejudice.

## ORDER

**IT IS ORDERED:**

1. The Petition is denied with prejudice.

2. The Court does not find its resolution of this habeas matter to be reasonably debatable, and a certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c); Rule 11 of the Rules Governing Section 2254 Cases. If Petitioner files a timely notice of appeal, the Clerk of Court shall forward a copy of the notice of appeal, together with this Order, to the United States Court of Appeals for the Ninth Circuit. Petitioner may seek a certificate of appealability from the Ninth Circuit by filing a request in that court.

---

[24] Lewis, C. S. *The Chronicles of Narnia: The Magician's Nephew* (Harper Collins 1955).

**MEMORANDUM DECISION AND ORDER - 70**

DATED: March 21, 2016



_____

Honorable Candy W. Dale
United States Magistrate Judge